Patricia LETT

v.

The **PROVIDENCE JOURNAL COMPANY.**

Louis GIULIANO

v.

The **PROVIDENCE JOURNAL COMPANY.**

No. 2000–62–APPEAL.

Supreme Court of Rhode Island.

May 23, 2002.

Joseph A. Kelly, Lauren E. Jones, C. Russell Bengtson, Providence, for plaintiff.

Joseph V. Cavanaugh, Jr., Raymond A. Marcaccio, Providence, Kristin E. Rodgers, for defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Finding that the plaintiffs, domestic and business partners Patricia Lett (Lett) and Louis Giuliano (Giuliano), had perpetrated a fraud on the court, a Superior Court trial justice called a halt to an ongoing jury trial and dismissed this libel lawsuit against the

defendant, The Providence Journal Company (the Journal). In 1990, Lett and Giuliano were promoting a new racetrack, to be located in Burrillville, when the Journal, owner of the largest daily newspaper in Rhode Island, published an article in the paper suggesting that they were connected to organized-crime figures. Thereafter, Lett and Giuliano filed separate complaints alleging that the Journal had defamed them. They now appeal from the Superior Court judgment that dismissed their libel complaints after the trial justice concluded that both of them had committed fraud on the court.[1]

In a pretrial ruling, the trial justice had excused Giuliano from testifying at his and Lett's consolidated libel trial. He did so because Giuliano's recent heart attack supposedly had rendered him unable to testify. Testimony from Lett and others, together with Giuliano's own affidavit, attested to his weakened physical and mental condition. Nevertheless, after beginning the trial and hearing testimony from several witnesses, the trial justice abruptly stopped the proceedings and viewed a videotape of Giuliano vigorously participating in a six-and-a-half-hour adversarial proceeding before an administrative tribunal in Massachusetts—even as Giuliano's jury trial was proceeding in Providence. The videotape showed an animated, finger-pointing, and gesticulating Giuliano engaged in, among other activities, testifying as a key witness, cross-examining another witness, conferring with his lawyer, and parrying hostile questions from opposing lawyers. The trial justice concluded that clear and convincing evidence

showed that plaintiffs had committed fraud on the court by misrepresenting Giuliano's supposed inability to testify during his libel trial even though he was doing all that and more at a concurrent hearing before a Massachusetts tribunal. As a result, the trial justice vacated his pretrial order excusing Giuliano from testifying and dismissed plaintiffs' complaints with prejudice. Below, we set forth the pertinent facts and explain why we affirm the judgment.

### Facts and Travel

In January 1999, a hearing justice consolidated the separate defamation complaints of Lett and Giuliano. At all times material to this case, Lett and Giuliano were living together and were otherwise involved with each other in a long-term personal and business relationship. The court had ordered the trial to begin on April 12, 1999, but Giuliano suffered a heart attack shortly before that date. As a result, the court ultimately delayed the start of the trial twice because of Giuliano's physical condition. Eventually, Lett asked the court to sever her trial from Giuliano's, but the trial justice denied her motion, setting both cases down for a consolidated jury trial to begin in September 1999. Asserting under oath that, after his most recent heart attack, "I only participate in activities that do not cause me any stress," Giuliano moved the court for permission not to testify at the trial. The Journal objected, believing that Giuliano was not only malingering but also that he would prove to be a helpful witness for the defense at the trial.

---

1. This is the third time we have reviewed issues pertaining to this case. Previously, we passed on various discovery rulings. *See Giuliano v. The Providence Journal Co.,* 704 A.2d 220 (R.I.1997) (mem.) and *Lett v. The Providence Journal Co.,* 703 A.2d 1125 (R.I.1997) (mem.). These decisions addressed the Jour-

nal's refusal to divulge certain sources used by a reporter who co-authored the challenged article. We remanded the cases to the Superior Court for further findings on that issue. After the remand, a hearing justice consolidated the cases and they proceeded to a trial on the merits.

On September 27 and 28, 1999, the trial justice convened a hearing on Giuliano's excusal motion. At the hearing, the parties presented evidence on whether Giuliano truly was unable to testify because of his physical and mental condition. The trial justice heard testimony from a number of witnesses, including Lett and Dr. Barbara Roberts, Giuliano's treating physician. Giuliano himself did not testify, but he submitted an affidavit to the court stating that, after his latest heart attack, he had reduced his daily activities significantly to the point where he now avoided any activities that caused him stress. The Journal countered with testimony from another physician, Dr. Albert Most, as well as from private investigators that the Journal had hired to observe Giuliano's comings and goings. Giuliano's live-in companion and business associate, Lett, presented her own personal-observation testimony to the court that corroborated Giuliano's purported inability to testify at the upcoming trial. She testified that Giuliano had difficulty remembering things ("he forgets"), such as the date ("he could ask me what's the date today. I'll tell him. Within a two-hour period he'll ask me four more times. At the fifth time, I'm aggravated."); that he had a poor attention span ("He has a very bad attention span."); that he would fall asleep easily while performing everyday tasks ("He could be reading a newspaper, he'll fall right to sleep"); and that she had to drive for him because of their mutual concern over his health ("I don't think he's safe to drive. I don't think he has the mindset to even be behind the wheel."). In short, based on her day-to-day personal observations of him, Lett substantiated Giuliano's portrayal of himself as a man who was physically and mentally unable to withstand the rigors of testifying at a trial. The Journal's private investigators attempted to undercut this testimony by detailing Giuliano's various

real estate and horseracing activities, including his efforts in connection with the opening of a racetrack in Massachusetts, and his driving of a vehicle at excessive speeds.

Perhaps the most telling testimony at the hearing, however, came from the medical experts. Doctor Roberts, Giuliano's treating physician, described how Giuliano's most recent heart attack had damaged his heart muscle. She noted that this was Giuliano's second heart attack since 1991, that both attacks had destroyed approximately two thirds of his heart muscle and that what little of a functioning heart he had left was not performing very efficiently. After detailing how Giuliano's heart was severely damaged, she summed up her opinion as follows: "[m]y opinion is that appearing and testifying at trial would undoubtedly be harmful * * * and it could precipitate acute episodes of congestive heart failure and perhaps an abnormal heart rhythm that could be fatal." In response, the Journal's medical expert did not dispute the medical situation as related by Giuliano's doctor. In fact, Dr. Most agreed that Giuliano's heart was "quite damaged." Nevertheless, he took issue with Dr. Robert's opinion that the condition of Giuliano's heart would prevent him from testifying. In Dr. Most's opinion, Giuliano still could testify without endangering his health.

Although the trial justice acknowledged that, business-wise, Giuliano apparently still "put in a pretty good day," he ultimately found the treating physician's testimony to be dispositive, concluding that

"[my] judgment [is] that any patient * * * [with Giuliano's medical prognosis] would exercise a right not to testify, and he would be doing that on the advice of his physician. I will grant the plaintiff's motion, for the reasons stated, to excuse him from attendance at the trial

of this case on the basis that he is unavailable because of illness."

The trial justice also heard arguments from the Journal alleging that plaintiffs were committing fraud on the court by spuriously asserting that Giuliano's medical condition rendered him unavailable to testify at trial. The trial justice denied this motion, citing the case of *Phocecne Sous–Marine v. U.S. Phosmarine, Inc.,* 682 F.2d 802 (9th Cir.1982) (holding that a party's attempts to delay a trial did not go to the merits of a claim, and therefore were not fraud on the court). He observed that any fraud committed by defendants related to a procedural matter, not to the merits of the case. Therefore, he noted, "[i]n this case, what is being pointed out to the Court is a delay of the trial date or, if you will, a tactic of trying to have the cases severed for trial. The motion to dismiss is denied." The case then proceeded to trial on October 4, 1999.

A few days into the trial, however, pursuant to Rule 60(b) of the Superior Court Rules of Civil Procedure, the Journal moved to vacate the trial justice's order denying its motion to dismiss, accusing plaintiffs of having committed fraud on the court as grounds for doing so. The trial justice stopped the trial and convened a hearing on October 8, 1999, to receive evidence on this motion. At that hearing, the trial justice viewed a videotape that the Journal's private investigator had obtained. The videotape showed Giuliano participating as a party in an adversarial proceeding that occurred two days earlier, on October 6, 1999—while his own libel case was being tried to a jury in Providence—at a hearing before the Massachusetts Racing Commission (commission). The hearing concerned Giuliano's appeal to the commission, asking it to overturn his recent expulsion from a horseracing track in Massachusetts for alleged improper ac-

tivities. According to Giuliano's representations to the commission, he had invested approximately $14,500,000 in this particular racetrack; therefore, he argued, he should not be expelled for the alleged misconduct.

The commission's hearing lasted approximately six-and-one-half hours with very limited breaks. Lett testified that after Giuliano received notice of his ejection she knew that Giuliano had planned to attend this hearing, but she believed it would be brief, and that it would not last anywhere near the six-and-a-half hours it eventually took to complete. The tape showed that Giuliano was not only present during the entire hearing, but also that he was actively engaged and seemingly attempting with every fiber of his mind and body to persuade the commission to overturn his ejection from the track. He vigorously cross-examined one witness himself, intently conferred with his attorney throughout, testified before the commission via a long and histrionic speech defending his actions, fielded hostile questions from opposing attorneys, and ultimately presented a thoroughly spirited and tenacious defense of himself. The videotape showed him sporadically waving his arms, raising his voice, jabbing his finger, and otherwise delivering an impassioned plea concerning why the commission should not eject him from the property. In sum, the tape showed Giuliano placing himself in a very stressful situation for an extended period, with no visible signs of fatigue, with no observable lack of mental acuity or physical stamina, and with the apparent ability to recall at will—with great specificity and no notes or other visible help—the pertinent facts and arguments to support his position. Moreover, during his testimony at the hearing, Giuliano asserted that he had been sleeping in his office at the racetrack immediately after his March 25 heart attack so that he could oversee the

planned opening of the track on April 19, 1997. This evidence plainly contradicted the post-heart-attack portrait of a feckless and enfeebled invalid that Lett and Giuliano had painted for the court when he asked to be excused from testifying, swearing that "I do not feel I could stand the stress of appearing and testifying at trial in this case, even though I would prefer to defend my reputation."

On October 13, 1999, the trial justice found that there was "a concerted effort by both of the plaintiffs to prevent the presentation of material evidence to this jury and to this Judge concerning questions of law and questions of fact * * *." Ultimately, the trial justice believed that Lett and Giuliano had entered into a scheme to commit fraud on the court by misrepresenting Giuliano's ability to testify at the trial, and that such fraud was sufficiently grievous to justify dismissing their complaints with prejudice. Although the trial justice acknowledged that lesser sanctions were available to respond to plaintiffs' misconduct, and that dismissal was "the severest sanction," he reasoned that "[t]he Court considers these extraordinary circumstances. I believe the parties have not acted in good faith. I see no possibility of another sanction, and I'm aware that the sanction of dismissal is the severest sanction, because it does not permit the Court and jury to address the merits of the case." As a result, on October 26, 1999, the trial justice entered an order vacating his earlier order denying the Journal's motion to dismiss, and dismissed both complaints with prejudice. Thereafter, Giuliano and Lett filed individual motions to vacate the trial justice's dismissal order on the grounds of newly discovered evidence and that the trial justice had overlooked evidence in his fraud-on-the-court ruling. After the trial justice denied these motions, both Giuliano and Lett filed timely appeals with this Court.

On appeal, plaintiffs argue that the trial justice erred in finding that they committed fraud on the court because the evidence did not demonstrate such fraud by clear and convincing evidence. They further contend that even if the trial justice did not err in this regard, he abused his discretion in imposing the severest sanction possible; to wit: dismissing their complaints with prejudice. Additionally, Lett individually argues that the trial justice erred in dismissing her case on the basis of Giuliano's alleged fraud on the court, and that the trial justice abused his discretion in refusing to view a videotape that purportedly demonstrated a similar type of fraud committed by the Journal. Finally, both plaintiffs argue that the trial justice erred in not granting their motions to vacate his dismissal order on the basis of newly discovered evidence. The Journal responds that the trial justice did not err when he found that Lett and Giuliano had committed fraud on the court, and that he did not abuse his discretion in imposing dismissal of their complaints as a sanction against the offending parties. Moreover, the Journal suggests, the trial justice correctly denied plaintiffs' separate motions to vacate the dismissal order.

## Analysis

The first issue we address is the appropriate standard of review applicable to the dismissal of Lett's and Giuliano's cases. Lett argues that we should apply a two-tiered approach, first reviewing the case *de novo* for any errors of law, and then assaying the court's factual findings for abuse of discretion. The Journal responds that Lett misstates what the proper standard of review should be on these issues, arguing that a *de novo* review is inappropriate because the fraud-on-the-court factual determination and the propriety of the dis-

missal sanction are the only questions before us.

 We hold that the appropriate standard of review for the trial justice's grant of the Journal's motion to vacate the excusal order and to dismiss both complaints, and for his subsequent rejection of plaintiffs' motions to vacate, is whether the trial justice abused his discretion. Lett is correct that our "prerogative [is] to review questions of law *de novo* because we believe that this Court is in the best position to decide the merits of a given question of law." *Votolato v. Merandi,* 747 A.2d 455, 460 (R.I.2000). Nevertheless, plaintiffs' have failed to assign any alleged error of law for us to review; rather, they have pointed to the factual circumstances of this case, and to how the trial justice allegedly misinterpreted those facts in finding fraud, in deciding to dismiss their cases, and in refusing to vacate that order. It is well established, however, that "[t]his Court will not disturb the findings of a trial justice sitting without a jury in a civil matter 'unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" *Paradis v. Heritage Loan and Investment Co.,* 701 A.2d 812, 813 (R.I.1997) (mem.) (quoting *Harris v. Town of Lincoln,* 668 A.2d 321, 326 (R.I.1995)).

## I

### Authority to Vacate the Order Excusing Giuliano from Testifying

We first address whether Rule 60(b)(3) authorized the trial justice to vacate his previous order excusing Giuliano from testifying because of his medical condition. Rule 60(b) provides in relevant part that "[o]n motion and on such terms as are just, the court may relieve a party * * * from a final judgment, order, or proceeding for the following reasons: * * * (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." In other cases dealing with fraud committed by litigants in which a court has made a final judgment, this Court has acknowledged a trial justice's authority to vacate such judgments under Rule 60(b). For example, in the case of *Friendly Home, Inc. v. Shareholders and Creditors of Royal Homestead Land Co.,* 477 A.2d 934 (R.I. 1984), the plaintiff brought suit against the shareholders of a corporation, but misled his attorney and the court into believing that he did not know the identity or location of those shareholders. The plaintiff's attorney served legal process on the other shareholders by publication, even though the plaintiff actually knew who they were and how to contact them. When they failed to appear in court, the plaintiff obtained a default judgment against these shareholders. After a trial justice denied the defendants' motion to vacate the default judgment based on the plaintiff's alleged fraud, this Court reversed, stating that "the plaintiff intended to misinform the court when it alleged that the identity and whereabouts of these defendants were unknown." *Id.* at 938. The Court went on to hold that the trial justice possessed the authority under Rule 60(b)(3) to vacate the default judgment for fraud on the court. *Friendly Home, Inc.,* 477 A.2d at 938.

 Although we have not yet had occasion to address the use of Rule 60(b)(3) to vacate orders in a pending action on the basis of a party's alleged fraudulent conduct, it is clear from the plain language of Rule 60(b) that a trial justice possesses such authority. Rule 60(b)(3) plainly states that a trial justice may relieve a party from an order for fraud or for

**364**

other misconduct committed by an adverse party. We now explicitly hold that Rule 60(b) provides a trial justice with the authority to vacate a previous order in pending litigation based upon the fraudulent conduct of one or more parties in obtaining such an order. Because the true issue in such cases is whether a party in fact has committed fraud or other misconduct warranting the vacation of the order, we review such orders for an abuse of discretion.

## II

## Fraud On the Court

■ The trial justice turned to a federal case from the First Circuit Court of Appeals, *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115 (1st Cir.1989), in defining the offense of fraud on the court. There, the First Circuit stated that

> "[a] 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Id.* at 1118.

Adopting this articulation of the doctrine as our own, we hold that the trial justice did not err in relying on this definition. Courts in other jurisdictions, *see, e.g., McDowell v. Seaboard Farms of Athens, Inc.*, No. 95–609–CIV–ORL–19, 1996 WL 684140 (M.D.Fla. Nov.4, 1996) (mem.) also have cited *Aoude* with approval, requiring the party alleging the existence of such misconduct to prove it by clear and convincing evidence. We concur.

The Massachusetts Supreme Judicial Court also has defined "fraud on the court" in the same way as *Aoude*. *See*

*Rockdale Management Co. v. Shawmut Bank, N.A.*, 418 Mass. 596, 638 N.E.2d 29, 31 (1994). In that case, the plaintiff submitted a forged document to the court to support his claim and testified under oath that the document was legitimate. *Id.* The defendants moved to dismiss the case based on the plaintiff's commission of fraud on the court. The Supreme Judicial Court held that the trial court did not abuse its discretion in dismissing the plaintiff's claim as a sanction for committing fraud on the court. *Id.* at 32.

Although, as discussed above, a trial justice may, under Rule 60(b)(3), vacate a previous order obtained by a party's committing fraud on the court, there is no specific statute or court rule authorizing a court in Rhode Island to punish such fraudulent conduct by dismissing the offender's lawsuit or by defaulting that party. Other jurisdictions that have addressed this issue, however, uniformly have held that courts possess the inherent authority to regulate the conduct of litigants who are trying cases before them and to sanction them for misconduct that amounts to fraud on the court. As the United States Supreme Court has put it,

> "tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud." *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,*

322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250, 1256 (1944).

 Trial justices must have the authority to protect the integrity of the judicial system from manipulation by unscrupulous, dishonest, or overreaching parties. Rules 11 and 37 of the Superior Court Rules of Civil Procedure also inform our consideration of the trial justice's response to the plaintiffs' misconduct in this case. The First Circuit, while considering a similar situation, stated that "[e]ven if the provisions of the [r]ules of [c]ivil [p]rocedure that permit the imposition of sanctions for litigation abuses are not strictly applicable here, they may nevertheless be used by analogy to guide our review of the district court's actions." *John's Insulation, Inc. v. L. Addison and Associates, Inc.,* 156 F.3d 101, 108 (1st Cir.1998); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243 (2d Cir.1985) (holding that a court may choose to sanction parties either under their inherent powers or pursuant to Fed.R.Civ.P. 11). Therefore, we conclude, trial courts possess the inherent authority to protect their integrity by sanctioning any fraudulent conduct by litigants that is directed toward the court itself or its processes, as informed by the procedures and sanctions available to the court and to the parties under Rules 11 and 37.[2]

 Rule 11 provides, in relevant part that "[i]f a pleading, motion, or other paper is signed in violation of this rule, *the court,* upon motion or *upon its own initiative, may impose upon* the person who signed it, *a represented party,* or both, *any appropriate sanction* \* \* \*." (Emphases

added.) This language is similar to, though not identical, to that of its federal counterpart. Rule 11(c) of the Federal Rules of Civil Procedure provides in relevant part that "the court may, subject to the conditions stated below, impose an *appropriate sanction* upon the attorneys, law firms, *or parties that* \* \* \* *are responsible for the violation.*" (Emphases added.) We are of the opinion that the emphasized language in these two versions of Rule 11 address essentially the same scenario: that is, a court may impose an appropriate sanction upon a represented party who fraudulently induces his or her attorney to file a document with the court for an improper purpose, whether the attorney is blameless or complicit with the client's wrongdoing. *See Union Planters Bank v. L & J Development Co.,* 115 F.3d 378, 384 (6th Cir.1997) (holding that a court may sanction a party that is " 'the root cause of the violations,' " and that Rule 11 "explicitly allows for the imposition of sanctions upon a party responsible for the rule's violation"). Here, the trial justice could have found that Giuliano's motion to be excused from testifying was a written motion submitted for an "improper purpose" prohibited by Rule 11: namely, excusing Giuliano from testifying when he truly was able to do so. Therefore, we conclude, the Superior Court could have, in its discretion, addressed plaintiffs' alleged misconduct under Rule 11, yet it was not required to do so, given its inherent power to punish a litigant for committing fraud on the court.

 Moreover, because the trial justice based his fraud-on-the-court ruling on the

---

**2.** This Court has stated that, under Rule 60(b)(3) of the Family Court Rules of Procedure for Domestic Relations (similar to Super.Ct.R.Civ.P. 60(b)(3)) even an innocent misrepresentation may be sufficient to provide relief from a judgment. *Pari v. Pari,* 558

A.2d 632, 637 (R.I.1989) (citing *In re Julie,* 114 R.I. 419, 422, 334 A.2d 212, 214 (1975)). Thus, the conduct complained of need not rise to the level of a crime to warrant relief from an order or a judgment.

factual circumstances presented to him, we will review this finding for an abuse of discretion. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The record shows that the trial justice believed that both Giuliano and Lett had entered into a scheme to defraud the court by exaggerating Giuliano's putative inability and unwillingness to place himself in potentially stressful situations, such as testifying during an adversarial proceeding. He also believed that they did so to prevent the Journal from calling him to the witness stand and from questioning him before the jury at trial. In concluding that plaintiffs had committed fraud on the court, the trial justice relied in part upon Giuliano's videotaped session before the commission.

Contrary to plaintiffs' claims, however, he did not solely rely on this videotape. In fact, he considered all the evidence that both parties had submitted on the issue of Giuliano's ability to testify at trial. Although it was not until after the Journal introduced the videotape of the commission's proceedings in support of its Rule 60(b) motion that the trial justice decided to vacate his previous order denying the Journal's motion to dismiss, the record does not reflect that the trial justice relied solely on this one piece of evidence in doing so. Rather, during the September hearing on Giuliano's excusal motion, he obtained conflicting evidence from the parties on Giuliano's ability to testify. Although he believed that, notwithstanding his heart condition, Giuliano remained fairly active and still "put in a pretty good day," the trial justice bowed to the recommendation of Giuliano's treating physician and allowed him to avoid testifying at his trial. But given the evidence of Giuliano's relatively active life and the medical opinion of Dr. Most, he certainly could have ruled otherwise. But once he witnessed Giuliano on the videotape testifying in pre-cisely the type of stressful environment that Giuliano, Lett, and Giuliano's physician all had claimed would be detrimental to his health—and doing so in a manner that left no doubt that Giuliano was physically and mentally able to testify in an adversarial proceeding—he changed his mind and concluded that plaintiffs had duped him. He believed that Giuliano's appearance before the commission contradicted his previous affidavit, as well as Lett's previous testimony, concerning what he was capable of doing mentally and physically. As a result, the trial justice found clear and convincing evidence that plaintiffs had committed fraud on the court by misrepresenting Giuliano's physical and mental capabilities and his ability to engage in stressful activities in an attempt to prevent him from testifying at his own libel trial. Nothing in our review of the record, including the videotape, indicates that the trial justice clearly erred in making this factual determination.

We hold, therefore, that the trial justice possessed the inherent authority to sanction a party or parties for committing fraud on the court. The trial justice was faced with a close and difficult decision when he initially excused Giuliano from testifying and from appearing as a witness during his own libel trial. He credited the expert witnesses for both parties, but, in the end, he relied more heavily on Dr. Roberts' opinion as Giuliano's treating physician. The trial justice also took into account Lett's corroborating testimony and Giuliano's own affidavit concerning how his heart attacks supposedly had enfeebled him. But once the Journal introduced the eye-opening videotape of Giuliano's appearance before the commission, the scales decidedly tipped the other way and it became clear to the trial justice that plaintiffs had entered into a conspiracy to prevent Giuliano from testifying at the tri-

al. Under these circumstances, we hold, he was entitled to draw the inferences he drew and to conclude that plaintiffs' misrepresentations constituted fraud on the court.

## III

## Dismissal as a Sanction for Fraud On the Court

■■■■ Having decided that committing fraud on the court is conduct that trial justices have the authority to punish and that the trial justice was acting within his discretion when he concluded that plaintiffs had committed fraud on the court in this case, we now review whether this trial justice abused his discretion by dismissing plaintiffs' complaints with prejudice. Specifically, we must decide whether the trial justice erred in imposing the ultimate sanction of dismissing the offending parties' claims with prejudice instead of administering some lesser punishment. In considering this question, we are mindful that the court's inherent powers "must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44, 111 S.Ct. at 2132, 115 L.Ed.2d at 45. We are of the opinion that the sanctions available to a trial court in these situations are analogous to those available for comparable violations of Rules 11 and 37. Under Rule 37(b), trial justices may punish violations of this rule and sanction misconduct by awarding attorneys fees and other costs, dismissing a complaint (or one or more claims therein), defaulting an offending party, striking claims or defenses, or precluding a party from introducing certain evidence. *Insurance Company of North America v. Kayser–Roth Corp.*, 770 A.2d 403, 411 (R.I.2001). A motion justice possesses the authority to impose any of these sanctions for discovery violations, in the exercise of his or her sound discretion, *id.*, and we do not believe that fraud on the

court should warrant less severe sanctions than those that are available for discovery violations. Moreover, when reviewing the imposition of sanctions—especially sanctions that are available in the alternative— we have stated that "[t]his [C]ourt is not likely to reverse on the basis of abuse of discretion when a rule provides for alternative sanctions and the trial justice selects the sanction that he or she deems the most appropriate for the particular case." *Id.* (quoting *Senn v. Surgidev Corp.*, 641 A.2d 1311, 1319 (R.I.1994)). *See also State v. Musumeci*, 717 A.2d 56, 60 (R.I.1998) (holding that the "trial justice is in the best position to determine the harm * * * and can best assess the possibility of mitigating that harm, his or her ruling * * * [therefore] will not be overturned absent a clear abuse of discretion").

■■■■ As we previously have stated, we also believe that Rule 11 violations and their attendant sanctions provide analogous precedents that can inform our review of a trial court's exercise of its inherent powers under the *Aoude* standard. *See Peerless Industrial Paint Coatings Co. v. Canam Steel Corp.*, 979 F.2d 685 (8th Cir.1992) (discussing Rule 11 and the commission of fraud on the court). As a general proposition, an appellate court will reverse a trial court's imposition of a sanction for a litigant's misconduct only if the trial court " 'based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.' " *Id.* at 686–87. *See also In re Sargent*, 136 F.3d 349 (4th Cir.1998) (holding that a district court's imposition of sanctions under Rule 11 is reviewed for an abuse of discretion); *American Inmate Paralegal Assoc. v. Cline*, 859 F.2d 59 (8th Cir.1988) (holding that the court will review the appropriateness of a Rule 11 sanction under an abuse of discretion standard). Therefore, by analogy to Rule 11 jurisprudence, we will

not reverse a trial justice's imposition of a sanction for fraud on the court unless the trial justice has abused his discretion in imposing that sanction.

We note also that, in accordance with the fraud-on-the-court decisions discussed below, Rule 11 provides trial courts with broad authority to fashion necessary sanctions against attorneys and parties. These sanctions have a twofold purpose: to deter repetition of the harm, and to remedy the harm caused. *Sargent,* 136 F.3d at 352–53. In effectuating this dual goal, a trial court has the discretionary authority to fashion what it deems to be an "appropriate" sanction, one that is responsive to the seriousness of the violation under the circumstances and sufficient to deter repetition of the misconduct in question. These sanctions can range from the dismissal of an action to the denial of a motion that lacks an adequate factual foundation. *Gemisys Corp. v. Phoenix American, Inc.,* 186 F.R.D. 551, 556 (N.D.Cal. 1999). Therefore, when faced with a Rule 11 violation, a trial justice possesses the authority to dismiss the action provided that he or she believes that this particular sanction is the best remedy to effectuate the dual purposes of Rule 11 in light of the nature of the violation.

As the Massachusetts Supreme Judicial Court noted in the *Rockdale* case, a trial justice's finding that a litigant has committed fraud on the court and his or her selection of the appropriate sanction for that fraud necessarily involve case-by-case, fact-intensive determinations. Many other jurisdictions have deemed dismissal an appropriate sanction for presenting false evidence to the court, for destroying evidence, or for otherwise impeding the discovery process by offering false or misleading testimony, or by falsifying past deposition testimony. *See, e.g., Rockdale Management Co.,* 638 N.E.2d at 32 (collecting cases—see especially, *Nichols v. Klein Tools, Inc.,* 949 F.2d 1047 (8th Cir. 1991)). We agree that the above-cited misconduct could, in the discretion of the trial justice, warrant the ultimate sanction of dismissal, depending on the gravity of the misconduct and its effect on the integrity of the judicial process in any given case.

But Lett and Giuliano further argue that, even if the trial justice did not err in finding that they both had committed fraud on the court, he erred in imposing the sanction of dismissal instead of some lesser sanction. The trial justice specifically stated that, under the circumstances, he did not believe that an alternative sanction, other than dismissal, was warranted; and given the trial justice's findings concerning the motive for plaintiffs' misconduct—preventing the Journal from questioning Giuliano in front of the jury, and thereby unfairly hampering the presentation of its defense—we are unable to conclude that he abused his discretion in doing so. A trial justice must have broad discretion to choose the appropriate response to any fraudulent conduct committed by litigants. Although trial justices should consider whether a less drastic sanction than dismissal would be appropriate—depending on the circumstances of the individual case and the gravity of the fraudulent conduct at issue—we will not require them to impose less drastic sanctions if the punishment they have imposed was justified in any given case. It is generally inadvisable to bind a trial justice's hands on discretionary matters such as selecting the appropriate sanction for a litigant's misconduct. *See Kayser–Roth Corp.,* 770 A.2d at 411.[3] Trial justices

3. A trial justice need not always impose lesser remedial sanctions before dismissing a case.

must be free to fashion appropriate remedies to address misconduct that occurs in the course of litigation before them. Although a trial court should exercise its inherent powers with restraint, we will not reverse a trial justice's dismissal of a case for fraud on the court absent an abuse of discretion. Here, the trial justice believed that plaintiffs had lied under oath when they swore that Giuliano was unable to testify at the trial of this case. Discerning no abuse of discretion in the court's meting out the ultimate civil sanction for that capital civil offense, we decline to reverse the dismissal of Lett's and Giuliano's complaints.

## IV

### Dismissal of Lett's Case for Her Own Misconduct

 Lett individually argues that even if Giuliano committed fraud on the Court, she did not do so, and therefore her libel claim against the Journal should not have suffered the same fate as Giuliano's case. The trial justice, however, considered whether he should just dismiss the suit brought by Giuliano, or whether he should also dismiss Lett's claim. Lett's argument ignores the trial justice's finding that both she and Giuliano were involved in a common scheme to commit fraud on the court by misrepresenting Giuliano's true ability to testify. Moreover, the trial justice believed that Giuliano's repeated requests for extension of the trial date, and ultimately his request for the court to excuse him from testifying, were in reality a ploy by both plaintiffs to have their cases severed so that Lett could have her case tried

separately. The trial justice concluded that Giuliano desperately wished to avoid testifying, and that Lett's supportive testimony on his behalf misled the court concerning Giuliano's physical and mental ability to testify, in furtherance of his own and Lett's attempts to avoid having him do so in either case. In this regard, the trial justice stated that to allow Lett's case to go forward alone would only serve plaintiffs' ultimate goal: "I believe [to allow] Ms. Lett's case to continue before this jury * * * would accomplish that which Mr. Giuliano wishes to accomplish"—that is, allowing Lett's case to proceed to trial without giving the jury any chance to assess Giuliano's credibility as a witness. The trial justice believed that the evidence demonstrated that the parties had colluded with one another in their attempt to prevent Giuliano from testifying; not only were they business partners, but they lived together, they worked together, they drove around in an automobile together, and, ultimately, they lied together. They even shared the same trial lawyers. Under these circumstances, the court reasonably found that the punishment should apply equally to both parties. We do not believe that the trial justice abused his discretion in selecting the dismissal sanction for Lett's crucial role in deceiving the court, and therefore we decline to reverse the trial justice's dismissal of her case.

## V

### Refusing to Consider Alleged Fraud on the Court by the Journal

 Lett next argues that the trial justice abused his discretion in refusing to

---

See, e.g., *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 12 (1st Cir.1985). To hold otherwise would impermissibly tie the trial justice's hands, even in the face of the most egregious fraudulent or outrageous conduct. Moreover, as we have

stated, this Court will review any dismissal for fraud on the court for an abuse of discretion, thereby affording aggrieved parties some measure of protection from sanctions that are unduly harsh under the circumstances.

view a videotape that allegedly exposed how the Journal fraudulently misrepresented to the court that Dan Barry (Barry), a former Journal reporter and a co-author of the allegedly defamatory Journal article about them, was unavailable to testify because of his medical condition. Barry apparently was battling throat cancer at the time this case came to trial in the fall of 1999. The essence of Lett's argument is that the Journal *also* committed fraud on the court with regard to its alleged misrepresentations to the court concerning Barry's availability to testify, and that these two offenses somehow should have canceled each other out.

There are many problems with Lett's argument. First, it was not only untimely with respect to the Journal's motion to delay the trial, but also it was irrelevant to the court's fraud-on-the-court finding against herself and Giuliano. Because the Journal's alleged misrepresentations about Barry's availability to testify would not undo plaintiffs' fraud on the court, the Barry videotape was irrelevant to the court's decision on the motion to vacate. In any event, Lett did not raise this argument until after the trial justice found that she had committed fraud on the court and dismissed her case as a result. Second, the two situations were fundamentally different. The Journal tried but failed to get the court to postpone the trial so that a witness could testify. Thus, whatever representations it made vis-à-vis Barry's availability proved to be bootless. Giuliano and Lett, on the other hand, not only tried but they succeeded in getting the court to agree that Giuliano, a party, should be excused from testifying in his own case. Thus, even were we to assume, arguendo, that the Journal had committed some type of fraud on the court with respect to Barry's availability, the trial justice did not abuse his discretion in declining to view the Barry videotape in connection with deciding whether to vacate his order finding that Lett and Giuliano were guilty of committing fraud on the court and dismissing their complaint.

■■■ Indeed, the trial justice noted the fundamental distinctions between these two situations: Barry was a mere witness, not a party, who lived and worked outside this jurisdiction, in New York. At the time of the trial, he no longer worked for the Journal. He was, therefore, beyond the trial-subpoena power of both the court and the parties.[4] These distinctions were critical because they indicated why the two situations were fundamentally different. In short, we do not see how the Journal's failed attempt to postpone the trial because of Barry's situation aids Lett in her appeal. Even if this Court believed that the trial justice had abused his discretion in not viewing the videotape concerning Barry, it still would not ameliorate Lett's commission of fraud on the court, and certainly it did not support her Rule 60(b) motion to vacate the court's dismissal order. Therefore, we conclude, the trial justice's refusal to view the videotape concerning Barry, and his failure to find that

4. Neither the Rhode Island Superior Court Rules of Civil Procedure nor any other provision requires a party to civil litigation to attend a trial of the party's claims or defenses. This rule applies to both a plaintiff and a defendant. *Pagliarini v. Doyle's Service, Inc.*, 470 A.2d 218, 219 (R.I.1984). Although Lett argues that Giuliano was merely a witness in her case as well, she fails to appreciate the import of the fact that both of their libel cases were consolidated for trial. Thus, at trial, both Lett and Giuliano would be parties and not just witnesses. To compel his personal attendance at the trial, the parties' counsel could have subpoenaed Giuliano, but they could not have done so vis-à-vis Barry because he lived and worked in another state.

the Journal had committed fraud on the court, were irrelevant to its ruling on plaintiffs' misconduct.

## VI

## Denial of the Motion to Vacate the Trial Justice's Dismissal Order on the Basis of New Evidence

 Finally, we review the trial justice's refusal to vacate his dismissal order under Rule 60(b) on plaintiffs' claims of newly discovered evidence about Giuliano's medical condition. First, the burden of proof was on plaintiffs as the moving parties. As discussed above, we will not disturb a trial justice's ruling on a Rule 60(b) motion absent a showing of abuse of discretion or an error of law. *See Frias v. Muratore*, 740 A.2d 340, 342 (R.I.1999). Second, a trial justice should not grant a motion to vacate a judgment (or, as here, an order) under Rule 60(b) for newly discovered evidence "unless the newly discovered evidence is of such a material and controlling nature that it would probably change the outcome of the case and unless it was not by the exercise of ordinary diligence discoverable in time to be presented at the original hearing." *Corrente v. Town of Coventry*, 116 R.I. 145, 147, 352 A.2d 654, 655 (1976).

Here, the newly discovered evidence that plaintiffs introduced dealt mainly with Giuliano's medical condition. But this evidence was not "newly discovered." The new affidavit of Dr. Roberts stated that, after viewing the videotape of Giuliano testifying before the commission, she stood by her previous medical opinion. But the Journal never contested the objective medical data that Giuliano's heart attacks had caused serious damage to his heart. The contested issue was whether it was fair to allow the Journal to subpoena him to testify at his libel trial in light of his medical condition and the supposedly limited and nonstressful nature of his other post-heart-attack activities. Doctor Roberts' affidavit, therefore, was not new evidence sufficient to change the outcome of the fraud-on-the-court ruling. Nor did Lett's belief that the Commission hearing would last only a few hours constitute "new evidence." Again, this was not the type of new evidence contemplated by the rule, and plaintiffs certainly could have discovered and presented it in the exercise of due diligence before the court ordered the dismissal of these claims.

We hold, therefore, that the plaintiffs failed to sustain their burden in demonstrating that any newly discovered evidence required the trial justice to vacate his dismissal order. Thus, we decline to reverse his decision.

## Conclusion

The trial justice properly defined the plaintiffs' misconduct as the commission of fraud on the court. He also properly applied that definition to the factual scenario that unfolded before him in this case. We can discern no abuse of discretion in his determination that clear and convincing evidence proved that both the plaintiffs committed fraud on the court by misleading the trial justice concerning Giuliano's ability to testify at the libel trial in this case. Moreover, the trial justice did not abuse his discretion in determining that the appropriate sanction for the plaintiffs' misconduct was to dismiss their claims against the Journal, with prejudice. We also do not believe that the trial justice abused his discretion in declining to view a videotape of an out-of-state witness who the Journal, in a failed attempt to postpone the trial, represented was unavailable to testify if the trial began when it was scheduled to do so. Finally, we uphold the trial justice's ruling that the plaintiffs presented no new evidence sufficient to cause

him to vacate his dismissal order. Accordingly we deny the plaintiffs' appeals and affirm the judgment dismissing their complaints with prejudice.