DECISION
This matter is before the Court on Plaintiff's Motion to Default Defendants Village at Waterman Lake, L.P., Village Retirement Communities LLC, and DP Realty, Inc. (collectively, "Defendants"). The Plaintiff, Christopher Buonanno, in his capacity as Executor of the Estate of Jennie Spirito ("Plaintiff"), asserts that defense counsel knowingly and intentionally violated the Rhode Island Confidentiality of Health Care Communications and Information Act ("the CHCCIA") and that Defendants should be defaulted as a result. In the alternative, Plaintiff moves the Court to disqualify defense counsel and law firm pursuant to Rule 1.7 of the Rhode Island Supreme Court Rules of Professional Conduct.
 I Facts and Travel
The Plaintiff brought this action on behalf of Ms. Spirito's Estate. Ms. Spirito was Plaintiff's eighty-nine year old aunt who suffered from Alzheimer's disease. In December 2003, Ms. Spirito resided in the Alzheimer's assisted living facility at the Village at Waterman Lake, *Page 2 
L.P. (the Village). During that winter, Ms. Spirito fell out of bed on at least two occasions and was treated at Rhode Island Hospital. On or about February 20, 2004, Ms. Spirito returned to the Village and was admitted to the nursing home unit at the Village where she was assigned to the care of attending physician Jennifer Ritzau, M.D. (Dr. Ritzau). Ms. Spirito died on February 27, 2004, at the Village. Dr. Ritzau completed the cause of death section on Ms. Spirito's death certificate.
It is undisputed that Ms. Spirito's full medical record from the Village was produced to Plaintiff's counsel earlier in this litigation. It is also undisputed that Dr. Ritzau held the title of Medical Director at the Village and maintained an office on the premises of the Village.
During the course of this litigation, Plaintiff's counsel deposed numerous employees and former employees of the Village. According to counsel for the Village, in all instances said counsel cooperated with Plaintiff's counsel to secure the various deponents' presence at these depositions. Indeed, defense counsel even met with employees or former employees of the Village in advance of each deposition to refresh that deponent's recollection from the existing medical records previously disclosed to Plaintiff's counsel.
The Plaintiff noticed Dr. Ritzau's deposition for July 20, 2009. Like other deponents, counsel for the Village coordinated Dr. Ritzau's schedule with Plaintiff's counsel and met with the deponent prior to the deposition. It is undisputed that Defendants' counsel believed at that time that Dr. Ritzau was an employee of the Village and presented Dr. Ritzau with the Village medical records that had already been produced in the course of discovery. During Dr. Ritzau's deposition, however, it was revealed that while Dr. Ritzau is the Medical Director of the Village, she is not an employee of the Village. Moreover, Dr. Ritzau testified that she believed that counsel for the Village also was representing her interests at the deposition. Furthermore, Dr. *Page 3 
Ritzau acknowledged that she had not obtained consent from representatives of Ms. Spirito to discuss Ms. Spirito's confidential health care information.
The Plaintiff now maintains that default should enter against Defendants based upon defense counsel's alleged knowing and intentional violation of G.L. 1956 § 5-37.3-4(b)(8)(i). Further, Plaintiff seeks to disqualify counsel for the Village pursuant to Rule 1.7 of the Rules of Professional Conduct. Additional facts will be supplied as needed.
 II Standard of Review
It is axiomatic that trial justices possess the inherent authority to protect the integrity of the judicial system by sanctioning unscrupulous, fraudulent, overreaching conduct by litigants that is directed toward the court itself or its processes. See Lett v.Providence Journal Co., 798 A.2d 355, 365 (R.I. 2002) (affirming trial judge's dismissal of suit based on plaintiffs' fraud on the court); see also Michalopoulos v. C D Restaurant,Inc., 847 A.2d 294, 300 (R.I. 2004) (trial judge has discretionary authority to fashion appropriate sanction for Rule 11 violation). Included among the sanctions available to a trial judge is dismissal or default. Lett, 798 A.2d at 368.
The power of a Court "to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." Lamb v. Pralex Corp.,333 F.Supp.2d 361, 363 (D.Virgin Islands 2004). "A party seeking disqualification of an opposing party's counsel bears a `heavy burden of proving facts required for disqualification.'"Haffenreffer v. Coleman, 2007 WL 2972575, at *2 (D.R.I. 2007) (quoting Evans v. Artek Systems Corp., 715 F.2 788, 792 (2nd Cir. 1983); Jacobs v. Eastern Wire Prods.Co., 2003 WL 21297120, at *2 (R.I. Super., May 7, 2003));see also Weetamoe Condominium Ass'n v. Town *Page 4 of Bristol, 2003 WL 21296848, at *2 (R.I. Super., May 7, 2003) ("In order to obtain disqualification of counsel, a moving party carries a heavy burden and must satisfy a high standard of proof.").
 III Analysis A The CHCCIA Claim
Plaintiff asserts that defense counsel knowingly and intentionally violated § 5-37.3-4(b)(8) when he conducted an ex parte
meeting with decedent's attending physician, Dr. Ritzau, and discussed with her the decedent's health care information. Plaintiff maintains that as a result of these actions, Plaintiff's case has been harmed irreparably because defense counsel transformed Dr. Ritzau from an independent witness into a defense witness. More specifically, Plaintiff alleges that Dr. Ritzau was transformed into a defense witness who advocated against her patient's interests by contradicting the cause of death set forth on Ms. Spirito's death certificate. Further, Plaintiff argues that defense counsel's conduct allegedly subjected both defense counsel and Dr. Ritzau to criminal penalties and civil liability for violating the CHCCIA. Plaintiff moves the Court to exercise its inherent powers to default and/or sanction Defendants.
Under common law, the confidential communication between physicians and patients was not recognized as a protected privilege in Rhode Island. See Lewis v. Roderick,617 A.2d 119, 121 (R.I. 1992). However, the Legislature now codifies this privilege in the CHCCIA. Seeid.; § 5-37.3-1 et seq. The purpose of the CHCCIA "is to establish safeguards for maintaining the integrity of confidential health care information that relates to an individual." Section 5-37.3-2. The so-called patient-physician privilege is not absolute, however, and § 5-37.3-4 *Page 5 
enumerates certain exceptions to the privilege. "These restrictions demonstrate the Legislature's intent to create a qualified, nonabsolute privilege that would protect a patient's interest in privacy and yet not hamper discovery in medical-malpractice actions." Lewis, 617 A.2d at 121.
In Lewis, our Supreme Court held that the "Legislature intended that the [patient-physician] privilege automatically be waived when a patient . . . elects to bring a medical-malpractice claim or otherwise puts his or her medical condition at issue."Id. In reaching this conclusion, the Court reasoned that because neither § 5-37-4 nor the Superior Court Rules of Civil Procedure explicitly prohibited ex parte interviews, such interviews impliedly were permissible methods of pretrial discovery.Id. at 122. In Donovan v. Bowling,706 A.2d 937, 940 (R.I. 1998), the Rhode Island Supreme Court reiterated that "defense counsel in a medical malpractice action was permitted to engage in ex parte communications with the plaintiff's treating physician, notwithstanding that the treating physician had been previously retained by the plaintiff to testify as her expert."
Following Donovan, the Legislature amended § 5-37.3-4(b)(8)(ii) to prohibit ex parte contacts and informal ex parte contacts with a plaintiff's health care provider. See P.L. 1998, ch. 180 and P.L. 1998, ch. 420. It is well-established that the interpretation of a statute is a question of law. See Palazzolo v. State ex rel. Tavares,746 A.2d 707, 711 (R.I. 2000) Where the language of a statute "is clear on its face, then the plain meaning of the statute must be given effect and this Court should not look elsewhere to discern the legislative intent." Retirement Bd. of Employees' RetirementSystem of State v. DiPrete, 845 A.2d 270, 297 (R.I. 2004) (internal quotations omitted). Accordingly, when "a statutory provision is unambiguous, there is no room for statutory construction and [this Court] must apply the statute as written."Id.; see also State *Page 6 v. Santos, 870 A.2d 1029, 1032 (R.I. 2005) ("The plain statutory language is the best indicator of legislative intent.").
Additionally, under our canons of statutory interpretation
 [t]he construction of legislative enactments is a matter reserved for the courts, . . . and, as final arbiter on questions of construction, it is this court's responsibility in interpreting a legislative enactment to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes.
State v. Greenberg, 951 A.2d 481, 489 (R.I. 2008) (quotingBrennan v. Kirby, 529 A.2d 633, 637 (R.I. 1987)). To accomplish this task, the Court must scrutinize "`the language, nature, and object of the statute[,]' to glean the intent of the Legislature." Id. (quoting State v. Pelz,765 A.2d 824, 829-30 (R.I. 2001)). However, "[t]his Court will not construe a statute to reach an absurd result." State v.Flores, 714 A.2d 581, 583 (R.I. 1998) (quoting Kaya v.Partington, 681 A.2d 256, 261 (R.I. 1996)).
Section 5-37.3-4(a) provides in pertinent part:
 (1) Except as provided in subsection (b) of this section or as specifically provided by the law, a patient's confidential health care information shall not be released or transferred without the written consent of the patient or his or her authorized representative. . . .
 (2) Any person who violates the provisions of this section may be liable for actual and punitive damages.
 (3) The court may award a reasonable attorney's fee at its discretion to the prevailing party in any civil action under this section.
 (4) Any person who knowingly and intentionally violates the provisions of this section shall, upon conviction, be fined not more than five thousand ($5,000) dollars for each violation, or imprisoned not more than six (6) months for each violation, or both.
 (5) Any contract or agreement which purports to waive the provisions of this section shall be declared null and void as against public policy. *Page 7 
Section 5-37.3-4(b) provides in pertinent part:
 (b) No consent for release or transfer of confidential health care information shall be required in the following situations:
 . . . .
 (8)(i) To the health care provider's own lawyer or medical liability insurance carrier if the patient whose information is at issue brings a medical liability action against a health care provider. (ii) Disclosure by a health care provider of a patient's health care information which is relevant to a civil action brought by the patient against any person or persons other than that health care provider may occur only under the discovery methods provided by the applicable rules of civil procedure (federal or state). This disclosure shall not be through ex parte contacts and not through informal ex parte contacts with the provider by persons other than the patient or his or her legal representative. . . .
(Emphasis added.)
In the instant matter, it is undisputed that defense counsel met with Ms. Spirito's treating physician, Dr. Ritzau, to discuss her upcoming deposition. At that ex parte meeting, defense counsel refreshed Dr. Ritzau's memory using Ms. Spirito's medical records that previously had been disclosed in this case. At the time of the meeting, defense counsel believed in good faith that Dr. Ritzau was employed by the Village. Assuming that was true, Dr. Ritzau would have fallen within the ambit of § 5-37.3-4(b)(8)(i), and therefore Plaintiff's consent would not have been needed. While it might have been prudent for defense counsel to verify Dr. Ritzau's status before conducting the meeting, the Court finds that any information that may have been discussed between defense counsel and Dr. Ritzau already had been disclosed to defense counsel vis-à-vis the production of Ms. Spirito's full medical record from the Village in the course of discovery. Consequently, while there may have been anex parte meeting between defense counsel and Dr. Ritzau, the Court cannot conclude that said meeting violated § 5-37.3-4(b)(8)(ii) because no new disclosures of health care information were made. *Page 8 
Under the circumstances presented, defaulting Defendants for anex parte meeting between their counsel and Dr. Ritzau is not warranted. Indeed, the sanction of default far exceeds the remedies set forth in the plain and ordinary language in § 5-37.3-4(a). As for the statutorily authorized sanctions, where the decedent's health care information already had been disclosed in earlier discovery and no new disclosure of health care information was made, there are no actual or punitive damages that are sought or that would be appropriate. Section 5-37.3-4(a)(2). There has been no separate civil action filed in which a prevailing party may be awarded attorneys' fees. Section 5-37.3-4(a)(3). Finally, the evidence of record does not support a finding that there was a knowing and intentional violation of § 5-37.3-4 which would lead to a criminal conviction and fine or imprisonment. Section 5-37.3-4(a)(4). Accordingly, this Court concludes that Defendants and their counsel should not be sanctioned for a mistaken belief that Dr. Ritzau was an employee of Defendant health care provider where all the health care information had previously been disclosed.
 B The Conflict of Interest Claim
Plaintiff also petitions the Court to disqualify Defendants' counsel and law firm pursuant to Rule 1.7 of the Rhode Island Supreme Court Rules of Professional Conduct because, Plaintiff maintains, defense counsel simultaneously represented both Defendants and Dr. Ritzau in violation of that Rule. Plaintiff asserts that defense counsel is barred from representing both the Village and Dr. Ritzau because their interests are adverse to one another. Specifically, Plaintiff asserts that Dr. Ritzau's expected trial testimony will be damaging to the Village and that defense counsel will be required to cross-examine his own client, Dr. Ritzau. *Page 9 
Rule 1.7 governs when and under what circumstances a lawyer is prohibited from representing a client in the face of a concurrent conflict of interest. Rule 1.7 provides that
A concurrent conflict of interest exists if:
 (1) the representation of one client will be directly adverse to another client; or
 (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
Rule 1.7 further provides that such a concurrent conflict of interest may be waived if:
 (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
 (2) the representation is not prohibited by law;
 (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
 (4) each affected client gives informed consent, confirmed in writing.
Rule 1.16 of the Rules of Professional Conduct obligates an attorney to withdraw from a representation of a client if the representation will result in a violation of the Rules of Professional Conduct. It provides in pertinent part: "a lawyer shall not represent a client, or where representation has commenced, shall withdraw from the representation of a client if: (1) the representation will result in a violation of the rules of professional conduct or other law." Rule 1.16. A conflict of interest in violation of Rule 1.7 would constitute such a violation. Comment 5 to Rule 1.7 states in pertinent part:
 Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by another client represented by the lawyer in an unrelated matter. Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict. The *Page 10 
lawyer must seek court approval where necessary and take steps to minimize harm to the clients.
(Emphasis added.)
Here, it is opposing counsel who seeks to have counsel disqualified pursuant to Rule 1.7. The use of disqualification motions has been addressed by other courts, and the rationale applies equally in this jurisdiction. Unless the underlying judicial process will be tainted by an attorney's conduct, the court should be reluctant to grant disqualification motions. Gray v.Rhode Island Dept. of Children, Youths and Families,937 F.Supp. 153, 156 (D.R.I. 1996); see alsoHaffenreffer v. Coleman, 2007 WL 2972575, at *2 (D.R.I. 2007) (disqualifying motions viewed with disfavor and heavy burden to sustain); Weetamoe Condominium Ass'n v. Town ofBristol, 2003 WL 21296848, at *2 (R.I. Super., May 7, 2003) (recognizing increasing tendency to use disqualification as a sword in attempt to gain perceived tactical advantage). The reason for this is that the disqualification of an attorney "is aimed to protect one attorney-client relationship, but . . . it also destroys another attorney-client relationship by depriving a party of representation of its own choosing. Motions to disqualify, therefore, should be viewed with extreme caution." Zimmerman v.Mahaska Bottling Co., 19 P.3d 784, 788 (Kan. 2001); seealso Daines v. Alcatel, 194 F.R.D. 678 (E.D. Wash. 2000) (quoting United States v. Titan Pacific ConstructionCorporation, 637 F.Supp. 1556, 1562 (W.D. Wash. 1986)) (observing that "[d]isqualification is `a drastic measure which courts should hesitate to impose except when absolutely necessary'"). Accordingly, "[a] motion to disqualify counsel requires the court to balance the right of a party to retain counsel of his choice and the substantial hardship which might result from disqualification as against the public perception of and the public trust in the judicial system."Lamb v. Pralex Corp.,333 F.Supp.2d 361, 363 (D.Virgin Islands 2004). *Page 11 
In drafting the Rules of Professional Conduct, the Rhode Island Supreme Court recognized what the rules were designed to do:
The Rules of Professional Conduct are rules of reason . . .
 The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.
Sup. Ct. R. Prof. Conduct, Art. V, "Scope."
Applying the Rhode Island Supreme Court Rules of Professional Conduct, the United States District Court for the District of Rhode Island denied a motion to disqualify and discussed disqualification in general:
 In deciding whether a party's counsel should be disqualified, a Court must balance the party's right to choose its counsel against the need to protect the integrity of the judicial process. Kevlik v. Goldstein, 724 F.2d 844, 850 (1st Cir. 1984). Disqualification is not a step to be taken lightly because courts have recognized that, in addition to delaying litigation and having a significant adverse effect on the client, such motions are often advanced for "tactical, not substantive, reasons." Moss v. TACC Intern. Corp., 776 F.Supp. 622, 623 (D. Mass. 1991). A party seeking disqualification of an opposing party's counsel bears a "heavy burden of proving facts required for disqualification." Evans v. Artek Systems Corp., 715 F.2 788, 792 (2nd Cir. 1983); Jacobs v. Eastern Wire Prods. Co., 2003 WL 21297120, at *2 (R.I. Super., May 7, 2003) ("Because motions to disqualify are viewed with disfavor a party seeking to disqualify carries a heavy burden and must satisfy a high standard of proof.").
Haffenreffer v. Coleman,2007 WL 2972575, at *2 (D.R.I. 2007) (emphasis added). Because of the increasingly strategic manner in which disqualification motions may be used, it is necessary *Page 12 
for the court to remain skeptical in considering such relief.Id. (citing Estrada v. Cabrera,632 F.Supp. 1174, 1175 (D.P.R. 1986)).
With respect to Rule 1.7, "[w]here the interests of the two parties are in some manner antagonistic to one another, before any lawyer is authorized to assume dual representation (or continue if the adversity appears after he has been retained), he [or she] must first satisfy himself [or herself] that there is no objectivereason why he [or she] cannot, despite such divergence of interest, faithfully represent them both." HartfordAcc. Indem. Co. v. Foster, 528 So.2d 255, 268 (Miss. 1988) (emphasis in original). If such a test "cannot be met, the lawyer should not accept employment in the first place (or terminate it, if begun)." Id.
Here, Plaintiff maintains that his case is wholly tainted by virtue of the communication between counsel for the Village and Dr. Ritzau. This Court disagrees. In the instant matter, the record reveals that counsel for the Defendants believed that Dr. Ritzau was an employee of Defendant Village when he met with her prior to the deposition and that as such, he also was representing her in that capacity. Likewise, it appears that Dr. Ritzau also mistakenly believed that she was represented by defense counsel. Nonetheless, Plaintiff asserts that defense counsel and his law firm should be disqualified due to an alleged conflict of interest. Plaintiff further asserts that defense counsel improperly coached Dr. Ritzau during the deposition, and that he transformed Dr. Ritzau into a defense witness who advocated against her patient's interests throughout the deposition. Specifically, Plaintiff asserts that Dr. Ritzau's deposition testimony contradicted the death certificate with respect to the cause of death.
The record reveals that the only information that defense counsel and Dr. Ritzau discussed prior to the deposition was the previously disclosed medical record of Ms. Spirito. Moreover, even if defense counsel represented Dr. Ritzau during a brief period of time, Dr. *Page 13 
Ritzau is not a named defendant in this case. While Dr. Ritzau and Defendants conceivably have adverse interests, there is no evidence that any such interests were affected by the deposition testimony. At the deposition, and before Dr. Ritzau began to testify about the specifics of the case, the fact that Dr. Ritzau was not an employee of Village was revealed to defense counsel. See
Deposition Transcript (Tr.), dated July 20, 2009, at 13. After carefully reviewing the deposition testimony, the Court cannot find that defense counsel "coached" Dr. Ritzau; rather, the testimony reveals that most of defense counsel's objections served to clarify questions posed by Plaintiff's counsel.[1]
Plaintiff asserts that Dr. Ritzau changed her conclusions with respect to the cause of death. The deposition suggests that Dr. Ritzau listed three items in the cause of death section of the death certificate.[2] According to Plaintiff, Dr. Ritzau indicated on the death certificate that Ms. Spirito's "fall on February 20th was a significant condition contributing to [her] death." (Plaintiff's Memorandum of Law at 7.)
During the deposition, the following colloquy took place:
 Q. Okay. Now on the bottom of Exhibit 2, Box 31A to 31F, do you see these boxes?
 A. Yes.
 Q. You indicated that Jennie Spirito had a fall on February 20th and fractured her hip at the assisted living part of Village at Waterman Lake in those boxes?
 A. Yes.
 Q. And why did you report that information in these boxes on this death certificate? *Page 14 
 A. Because it asked me if there had been any injuries and so I was reporting that injury.
 Q. In your mind, when you filled out this report, was there any connection between the fall on February 20th and Mrs. Spirito's death?
 A. No.
(Tr. at 116.)
While Plaintiff may not have liked Dr. Ritzau's answers to this line of questioning, there is nothing in the record to suggest that defense counsel played any role in eliciting such responses. Furthermore, while Plaintiff uses this as an example of how Dr. Ritzau advocated against her patient's interests, the Court does not regard these responses as advocating for anyone. If, as Plaintiff asserts, Dr. Ritzau indeed did change her assessment of the cause of death, Plaintiff's counsel certainly would be free to inquire of Dr. Ritzau into this very issue at trial.
In conclusion, even if an attorney-client relationship between defense counsel and Dr. Ritzau at some point existed, such relationship no longer exists and there is no evidence of any deliberate misconduct on the part of defense counsel. Furthermore, after reviewing the record, this Court cannot conclude that defense counsel acted on behalf of Dr. Ritzau after hearing that she was not employed by Village. This Court cannot conclude that a Rule 1.7 violation has occurred which would dictate the extreme sanction of disqualifying Defendants' counsel of choice. Consequently, the Court denies Plaintiff's Motion to Disqualify Defense counsel and law firm.
 IV Conclusion
For the foregoing reasons, Plaintiff's Motion to Default Defendants and/or Disqualify is denied. An order consistent with this Decision shall be prepared by counsel for Defendants.
[1] Plaintiff has not alleged that defense counsel's objections were in violation of the role an attorney may have at a deposition as discussed at length in Kelvey v. Coughlin,625 A.2d 775, 777 (R.I. 1993).
[2] Not having been presented with a copy of the death certificate, this Court is unable to verify the veracity of this assertion.