Deborah M. DAWKINS

v.

David M. SIWICKI, M.D.

No. 2008–18–Appeal.

Supreme Court of Rhode Island.

June 17, 2011.

ion that these cases equally should be applied to these tort analyses.

John D. Deacon, Jr., Esq., Providence, for Plaintiff.

Robert P. Landau, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This appeal arises from a medical malpractice lawsuit in which the plaintiff, Deborah M. Dawkins (Ms. Dawkins or plaintiff) alleged negligent diagnosis and

treatment by the defendant, Dr. David Siwicki (Dr. Siwicki or defendant) during an emergency room visit in August 1998, after the plaintiff fell and injured her wrist. The complaint was filed in August 2001 and trial commenced in March 2007.[1] The claim and appeal stem from an injury the plaintiff suffered to her left wrist and from which she never recovered fully. The plaintiff initially was treated by the defendant, and subsequently underwent multiple surgeries over the span of several years, which she alleged were necessary because of the defendant's alleged negligent diagnosis and treatment of her injury. The jury returned a verdict for the defendant, and the plaintiff timely filed this appeal. She raises a number of arguments before this Court, many of which center around the defense of the plaintiff's comparative negligence based on the defendant's contention that cigarette smoking impeded her treatment. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts and Travel

The plaintiff injured her left wrist in August 1998 when she fell and attempted to break the fall with her left hand. The plaintiff sought treatment at Kent County Hospital in Warwick, and was examined by Dr. Siwicki in the emergency room. The defendant ordered X-rays of the wrist and, after reviewing the films, he concluded that plaintiff had sprained the scaphoid bone in her left wrist.[2] Her wrist was wrapped in a splint and ace bandages. The plaintiff testified that she was surprised by defendant's diagnosis, convinced that she had broken and not sprained the bone. The plaintiff and defendant gave different accounts of what next transpired. Ms. Dawkins testified that Dr. Siwicki advised her that if the wrist did not feel better in a week, she should see her family physician. Doctor Siwicki testified that based on his routine practice when treating patients with similar symptoms and also, with patients who disagreed with a diagnosis, he would have advised plaintiff of the possibility that there was a fracture that was not apparent on the X-ray and that she should follow-up with her own doctor. The chart notes he compiled for the visit stated, "follow-up, Dr. Golomb [plaintiff's primary care physician], one week."

The plaintiff testified that defendant did not advise her that there was a possibility of a fracture, nor did he explain to her that initial X-rays can be negative and that a bone fracture may be observable in subsequent X-rays. The plaintiff also testified that Dr. Siwicki failed to explain how long she should maintain the splint on her wrist; such that when the swelling and pain began to subside after several days, she returned to work and began "weaning

1. The complaint also included two other defendants, Kent County Hospital, Dr. Siwicki's employer, and Dr. Kei Doi (Dr. Doi), a radiologist. The plaintiff and the hospital apparently settled, and the hospital was dismissed from the lawsuit in September 2005. In February 2007, plaintiff voluntarily dismissed Dr. Doi from the case.

2. Doctor Edward Akelman, an expert witness for defendant, explained that "[t]he scaphoid bone is on the thumb side of the wrist. [It is] actually this ship kind of shaped bone, like a hull, that starts in the middle part of the radius." Doctor Alfred Frankel, an expert witness for plaintiff, testified that "[t]he scaphoid [bone] or navicular[,] is the cornerstone * * * of the wrist. [It is] one of eight small carpal bones in your wrist, but the scaphoid or navicular is the key articulation, the joint between the major bones of your forearm and your hand." Doctor Frankel also explained that "[i]f you hitchhike your thumb[,] * * * at the base of the thumb [you will] see two tendons that form a small little depression. * * * [This is known] as the [anatomic] snuff box. Underneath it is the navicular bone[.]"

off [of] the splint." Over the next several months, plaintiff continued to have pain, that "[n]ever [c]ompletely" vanished; but which she described as being intermittent rather than constant.

In January 1999, convinced that something was wrong with her wrist, Ms. Dawkins decided to consult an orthopedic surgeon, Dr. Vaughn G. Gooding, Jr. (Dr. Gooding). During her initial visit with Dr. Gooding, he diagnosed plaintiff as having a nonunion of her scaphoid bone, caused by a fracture that had not healed.[3] He recommended surgery to attempt to repair and reduce the fracture, noting that she likely would need bone grafting. Doctor Gooding performed the recommended surgery in January 1999; however, in the following months, he saw no evidence that the fracture was healing. By April 1999, there was some indication of healing, but he observed that Ms. Dawkins had increasing pain, appeared to have generalized osteopenia,[4] and there was also an indication of avascular necrosis.[5] At this juncture, Dr. Gooding recommended that plaintiff undergo intercarpal fusion surgery. Between May 1999 and July 2003, plaintiff had six additional surgeries in an attempt at intercarpal fusion and carpal-tunnel-syndrome release. Doctor Gooding continued to treat plaintiff through November 2004.

During plaintiff's initial visit with Dr. Gooding, he asked her if she smoked cigarettes, and she told him that she did. Doctor Gooding's notes showed that plaintiff informed him that she smoked one-and-one-half packs of cigarettes per day. It is undisputed that plaintiff continued to smoke throughout the course of her treatment with Dr. Gooding. The plaintiff testified that Dr. Gooding never told her to stop smoking, and Dr. Gooding testified that he did not specifically remember doing so, although he admitted that he often advises his patients to stop smoking. On cross-examination, Dr. Gooding stated that smoking decreases the rate of fusion of the bones, making it more difficult to achieve union of the bones. The plaintiff admitted on cross-examination that based on common sense, she understood that smoking narrows blood vessels and that consequently, if a bone is not getting an adequate supply of blood, it may not heal. However, plaintiff also stated that it had never occurred to her that smoking could impair the healing process.

In addition to this testimony, defendant presented expert testimony about smoking's deleterious effects on bone healing.[6] Doctor Edward Akelman (Dr. Akelman), an orthopedic surgeon, explained that smoking "diminish[es] the body's ability to drive blood to a fracture or healing area. * * * [W]ithout oxygen, which is delivered

---

**3.** Doctor Akelman explained "[a] scaphoid nonunion, like all bone nonunions, means that a bone was broken and the bone [has not] healed. So nonunion means [there has] been no fracture healing."

**4.** Osteopenia is a "condition of subnormally mineralized bone, usually the result of a failure of the rate of bone matrix synthesis to compensate for the rate of bone lysis." Mosby's Medical, Nursing, and Allied Health Dictionary 854 (3d ed. 1990). Doctor Gooding explained that osteopenia causes the bone to be washed out and thus it is not as dense as it would normally look.

**5.** Doctor Gooding explained that " '[a]vascular' means loss of blood supply, 'necrosis' means death, so [it is] a description of a condition in [the] bone when the blood supply is lost."

**6.** Much of plaintiff's appeal deals with the expert testimony about smoking. As such, the procedural posture of the pretrial motions, objections and the trial justice's decision to admit expert testimony on the issue is relevant to our analysis. We detail this in our analysis section below.

by the blood at that area, there is limited ability of the bone to heal. * * * The healing either [does not] work or it takes longer." Doctor Akelman said his opinion was based on his experience treating patients, stating, "I've seen poor outcomes from patients who are smokers, and I require them to stop smoking."

There was also expert medical testimony—from both sides—about the proper standard of care required of defendant, and whether he met or breached his duty to plaintiff when he treated her in the emergency room. These witnesses rendered expert opinions about what caused the initial nonunion of plaintiff's wrist before January 1999, and what caused the subsequent failure of the wrist to heal after plaintiff's first surgery in January 1999. Not surprisingly, the experts offered different opinions on almost every issue. The one point that the experts agreed on was that scaphoid fractures are not always visible on initial X-rays and that a fracture can appear on subsequent X-rays, sometimes two to three weeks later. However, the witnesses disagreed about how a physician properly should address this eventuality. Doctor Alfred R. Frankel (Dr. Frankel), an emergency room doctor and former orthopedic surgeon, testified for plaintiff that the proper standard of care in treating a patient such as plaintiff, required defendant to have "advised his patient of the possibility of a fracture, treated her as if she had one, and advised her that she needed another X-ray in two weeks." Alternatively, Doctors Akelman and Phillip Brewer (Dr. Brewer), an emergency room physician, testified that the proper standard of care was to treat plaintiff's injury as a sprain and to advise her to follow-up with her own doctor. Neither physician thought additional X-rays were necessary. Based on their respective opinions, Dr. Frankel opined that defendant had breached his duty to plaintiff,

while Doctors Akelman and Brewer concluded that defendant's diagnosis and treatment fell within the proper standard of care.

The doctors also disagreed about how the wrist initially should have been immobilized. Dr. Frankel stated that the proper standard of care requires that the wrist and thumb be secured in a device called the "thumb spica" splint because it immobilizes the thumb and wrist all the way up to the elbow. Doctor Frankel stated that a volar splint, the type used on Ms. Dawkins, was inappropriate because a volar splint does not properly immobilize the thumb. Doctor Akelman testified that the standard of care did not require defendant to use a thumb spica splint and that in his opinion, the volar splint is the better choice because it provides greater support to the wrist and to the scaphoid bone.

The experts next gave their opinions about what they believed caused the initial and subsequent nonunions of plaintiff's wrist. Together, Dr. Ira J. Singer (Dr. Singer), an orthopedic surgeon, and Dr. Frankel, testified for plaintiff that the initial nonunion, subsequent nonunion, accompanying avascular necrosis and arthritis were caused by a "cascade of events, * * * initiated by the nonunion of the scaphoid[,]" which ultimately were causally related to the improper diagnosis and treatment of plaintiff's initial injury. Doctor Singer conceded on cross-examination that a number of factors can affect a nonunion, including blood supply to the bone.

On the other hand, Dr. Akelman stated that in his opinion, he believed the initial nonunion was caused by plaintiff's lack of immobilization, specifically because plaintiff removed the splint too soon and failed to follow-up with her primary care physician. "The lack of immobilization of an acute scaphoid fracture in this situation

causes the two bone ends not to heal. They separate and they develop a nonunion. This is a classic set-up for a nonunion, a bone that's not held long enough together to heal." According to Dr. Akelman, the subsequent nonunion, after Dr. Gooding's first surgery, largely was caused by plaintiff's smoking, stating "[i]t is my opinion that her smoking had a negative impact on her healing, requiring multiple surgeries[.]" The witness explained that smokers have a much higher risk of not healing from scaphoid nonunion surgery and intercarpal fusion surgery. He stated, "[it is] my opinion that Ms. Dawkins' surgery would have been successful if she had not been a smoker at the time of the first surgery and subsequent surgeries." Lastly, he said "[it is] my medical opinion that the cause of her avascular necrosis, which is the death of the bone * * * was related to both the fracture not healing and the fact that she was a smoker."

At the close of the evidence, plaintiff moved for judgment as a matter of law in accordance with Rule 50 of the Superior Court Rules of Civil Procedure, arguing that as a matter of law, defendant had breached his duty of care and that plaintiff had not been comparatively negligent. The plaintiff's motion was denied and, without objection, the case was submitted to the jury by way of a special verdict form.[7] After the jury returned a verdict for defendant, plaintiff renewed her motion for judgment as a matter of law and alternatively moved for a new trial, both of which were denied. The plaintiff then filed this appeal.

Before this Court, plaintiff makes a number of arguments, many of which center around the evidence of plaintiff's smoking, and some arguments that are not properly before us. Specifically, she asserts that the trial justice erred by (1) granting defendant's motion to quash plaintiff's subpoena *duces tecum;* (2) allowing defendant to supplement his interrogatories with medical literature days before trial; (3) failing to conduct a pretrial hearing on the admissibility of smoking evidence as it relates to bone healing; (4) denying plaintiff's motion *in limine* and by failing to give a proper limiting instruction on the smoking evidence; (5) allowing evidence of defendant's habit or routine practice about advising patients to follow-up with their physician; (6) failing to grant plaintiff's motions for judgment as a matter of law with respect to defendant's breach of the proper standard of care and plaintiff's lack of contributory negligence; (7) failing to grant plaintiff's motion for a new trial; and (8) failing to find that defendant had committed a fraud upon the court. We have changed the order of these issues and divided our analysis according to the pretrial, trial and post-verdict stages of the trial proceedings.

# I

## Pretrial Rulings

### 1. Subpoena *Duces Tecum*

■ Shortly before trial, plaintiff moved to subpoena defendant's experts, "seeking all documents specifically reflecting or relating to any experience treating any patients within the following parameters: age from thirty to fifty years, smoke at least one pack of cigarettes a day, patient had established nonunion of scaphoid frac-

---

7. In question 1 of the special verdict form, the jurors were asked to decide whether "the [d]efendant, Dr. David Siwicki [was] negligent, which negligence was a proximate cause of the [p]laintiff Deborah M. Dawkins['] inju-

ries and damages[.]" The verdict form is a basis of one of plaintiff's arguments on appeal. Again, we detail the pertinent facts surrounding the jury instructions and verdict form below in our analysis.

ture for at least four months prior to diagnosis of fracture, patient upon diagnosis of fracture and learning of existence of fracture stopping smoking[.]" The defendant moved to quash the subpoena, and the trial justice granted the motion in accordance with Rule 45 of the Superior Court Rules of Civil Procedure,[8] ultimately determining that plaintiff's motion was overly burdensome and excessive and, based on the facts of the case, unnecessary.

 "We have consistently held that '[i]n granting or denying discovery motions, a Superior Court justice has broad discretion.'" *Travelers Insurance Co. v. Hindle,* 748 A.2d 256, 259 (R.I.2000) (quoting *Colvin v. Lekas,* 731 A.2d 718, 720 (R.I.1999)). Further, we will not disturb a trial justice's decision relating to discovery "save for an abuse of that discretion." *Hindle,* 748 A.2d at 259 (quoting *Colvin,* 731 A.2d at 720). We are satisfied that the trial justice, faced with an eleventh-hour request requiring a massive review of patient records, which may or may not have been available to the witnesses, did not abuse his discretion when he granted defendant's motion to quash the subpoena. The request was unduly burdensome and appropriately quashed.[9]

### 2. Defendant's Pretrial Production of Medical Literature

Many of plaintiff's appellate contentions pertain to defendant's defense of comparative negligence because Ms. Dawkins continued to smoke after her physician alleg-

edly told her to stop. The plaintiff argues that the trial justice made both pretrial errors and erred during the case-in-chief when he allowed evidence of plaintiff's smoking and by subsequently failing to limit the reach of such evidence. Although plaintiff's cigarette smoking may have clouded the issues in this case, we are satisfied that the jury was able to push through the haze and reach a decision based on the evidence before it. Additionally, we are of the opinion that any errors with respect to the failure of the trial justice properly to instruct the jury on the issue of smoking was not preserved for appellate review because plaintiff failed to object. *See State v. Marsich,* 10 A.3d 435, 441 (R.I.2010) (discussing the well settled "raise-or-waive" rule that precludes us from considering issues at the appellate level that were not properly presented at the trial court).

 Shortly before trial, plaintiff filed a motion *in limine,* seeking a *DiPetrillo* hearing to exclude defendant's expert testimony on smoking. The plaintiff's argument centered, in part, on her contention that defendant had failed to produce any medical or scientific literature that his experts would rely on at trial, which, plaintiff asserts, amounts to a complete lack of scientific evidence to support defendant's purported theory. The plaintiff argues that this expert testimony should have been excluded for lack of any medical or scientific literature. The defendant countered that medical literature existed but

---

8. Rule 45(c)(3)(A) of the Superior Court Rules of Civil Procedure provides:
 "On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it:
 (i) Fails to allow reasonable time for compliance;
 (ii) Requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iii) Subjects a person to undue burden."

9. We note that plaintiff did not conduct depositions of defendant's expert medical witnesses that would have afforded an opportunity to explore their respective experiences in treating scaphoid fractures in patients who smoke.

that his experts were not intending to rely on any specific literature, which is the reason defendant never produced any during the discovery phase.

The trial justice declined to rule on the motion *in limine*, electing instead to conduct a *voir dire* of defendant's experts during trial; however, to decide whether a *DiPetrillo* hearing was required and decide what defendant was permitted to say about smoking during jury selection, the trial justice directed defendant to produce medical literature on this issue. The trial justice ordered defendant to produce the "facts and circumstances underlying the opinion that would be discussed" by defendant's two medical experts. Consequently, defendant submitted substantial material, consisting of studies related to scaphoid fractures and smoking. The plaintiff argues that it was error for the trial justice to allow defendant to supplement his answers to plaintiff's interrogatories because it violated the court's previous scheduling order and because it was ordered less than thirty days prior to the scheduled start date of trial, in violation of Rule 33 of the Superior Court Rules of Civil Procedure.[10] The defendant responds that plaintiff misconceived the purpose of the trial justice's order; he argues that the only reason defendant produced any medical literature was in response to the trial justice's request for materials to assist him in deciding whether a *DiPetrillo* hearing concerning the scientific reliability of the smoking evidence was necessary.

■ After a careful reading of the record before us, we are satisfied that the material the trial justice ordered produced was not an attempt by defendant to supplement interrogatories, but rather was provided in compliance with the court's directive. Significantly, the record discloses that defendant's experts did not rely upon any medical or scientific literature during their testimony. Rule 33(c) "serves to prevent trial by ambush." *Neri v. Nationwide Mutual Fire Insurance Co.*, 719 A.2d 1150, 1152 (R.I.1998). It is designed "to enable litigants to prepare for trial free from the elements of surprise and concealment so that judgments can rest upon the merits of the case rather than the skill and maneuvering of counsel." *Id.* (quoting *Gormley v. Vartian*, 121 R.I. 770, 775, 403 A.2d 256, 259 (1979)). We do not discern a Rule 33 violation in this case, nor are we of the opinion that plaintiff was ambushed days before trial. The purpose and use of the materials ordered produced by the court was to aid the trial justice in making his pretrial determination. Because defendant's experts did not rely on those materials or testify about those materials during trial, Rule 33 was not violated in this case.

### 3. Refusal to Conduct a Pretrial *DiPetrillo* Hearing

■ The plaintiff also argues that the trial justice erred in denying her motion for a *DiPetrillo* hearing, based on her contention that there was no scientific evidence to support the proposition that smoking caused either the initial nonunion, or the subsequent nonunion of the scaphoid bone. The plaintiff argues that in accordance with Rule 104(a) of the Rhode

---

**10.** Rule 33(c) of the Superior Court Rules of Civil Procedure, *"Continuing Duty to Answer"* provides:

"If the party furnishing answers to interrogatories subsequently shall obtain information which renders such answers incomplete or incorrect, amended answers shall be served within a reasonable time thereafter but not later than 30 days prior to the day fixed for trial. Thereafter amendments may be allowed only on motion and upon such terms as the court may direct."

Island Rules of Evidence [11] and *DiPetrillo v. Dow Chemical Co.*, 729 A.2d 677 (R.I. 1999), the trial justice was required to act as the court's gatekeeper and conduct an evidentiary hearing to determine whether medical opinion testimony, which she contends is novel scientific evidence, was sufficiently reliable to place before the jury. The defendant responds that this evidence is not a novel medical theory and thus, the trial justice was not required to hold a *DiPetrillo* hearing. In denying the motion, the trial justice determined:

> "[T]he [c]ourt is sufficiently satisfied in looking at the material that was provided that [this is] not a novel issue. It's not an issue that the [c]ourt is concerned can't be adequately substantiated and explored by the plaintiff at trial. I don't think it requires * * * [a] *Daubert* or *DiPetrillo* hearing."

In *DiPetrillo*, 729 A.2d at 686, this Court addressed the landmark United States Supreme Court opinion, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (*Daubert*) and proceeded to "offer guidance on the standard for admissibility that should govern preliminary hearings and hearings out of the presence of the jury." *DiPetrillo*, 729 A.2d at 686. Specifically, we noted:

> "Such hearings would address any genuine issue of the validity of the scientific theory to be applied in cases, for example, of mass toxic torts, products liability, medical malpractice, environmental, criminal cases, or in the emerging fields of genetic engineering and organ harvesting, in which evidence of toxicology,

epidemiology, immunology, risk analysis, or genetics to name a few may be presented." *Id.*

We further stated that in such cases, "within discretion, the trial justice must control the gateway for expert scientific testimony" *id.*, by conducting an early, preliminary assessment of the evidence in accordance with Rule 104:

> "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine the fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *DiPetrillo*, 729 A.2d at 686–87 (quoting *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786).

In the case before us, the trial justice ruled that a *DiPetrillo* hearing was not necessary because, based on the literature provided by defendant, the deleterious effect of smoking on bone healing was neither novel nor a cutting-edge medical or scientific breakthrough, such that there was a need for an evidentiary hearing to determine its validity. The plaintiff did not produce any evidence or offer any testimony to the contrary and, in the context of this case, we are not persuaded that a *DiPetrillo* hearing was necessary. Indeed, on appeal, plaintiff's chief complaint about the smoking evidence centers on her discovery-violation contentions and the fact

---

11. Rule 104(a) of the Rhode Island Rules of Evidence states:

*"Questions of Admissibility Generally.* Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges."

that Dr. Akelman's opinion that the effects of smoking on initial bone healing was not as defendant represented to the trial justice during the preliminary hearings. (The plaintiff characterizes this as "a fraud upon the [c]ourt," an issue we shall address herein).

Accordingly, we are satisfied that the trial justice did not abuse his discretion in refusing to conduct a *DiPetrillo* hearing, nor did he err in declining to exclude the evidence *in limine*. Once the trial was in full swing, the trial justice revisited the issue of Dr. Akelman's testimony and conducted an evidentiary hearing, outside the presence of the jury, concerning the scope of Dr. Akelman's testimony. The trial justice ultimately limited Dr. Akelman's testimony to the effects of smoking on the post-surgical nonunion, finding that there was inadequate foundation to allow testimony about the effects of smoking on plaintiff's initial nonunion. Additionally, although plaintiff posed some objections to the testimony about smoking, she failed to object on the basis that the evidence lacked scientific or medical reliability or validity.

### 4. Denial of Plaintiff's Motion *In Limine*

■ The plaintiff next contends that the trial justice committed reversible error and abused his discretion when he denied plaintiff's motion *in limine* to exclude evidence of her smoking, or at minimum limit its reach, in accordance with Rule 403 of the Rhode Island Rules of Evidence. Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The plaintiff argues that there was *no* probative value of the evidence that she smoked

because Dr. Akelman testified that there was no good science "one way or the other" that smoking impeded the initial nonunion of plaintiff's fracture. The plaintiff contends that any probative value of this type of evidence substantially was outweighed by the unfair prejudice, confusion of the issues and the danger of misleading the jury. Additionally, plaintiff argues the trial justice failed to distinguish the effects of plaintiff's pre-injury smoking from post-surgical smoking.

The defendant responds that evidence of smoking was probative to the issues before the jury and further, that plaintiff has taken Dr. Akelman's testimony out of context. After reviewing the record, we agree with defendant. During a hearing outside the presence of the jury, Dr. Akelman opined:

> "I would go out of my way to talk with [a patient] to make sure [the patient] stopped smoking. Because it's an additional risk factor. It adds to your risk of healing. *In terms of quantifying it, I don't think there is good science one way or the other about that* within the frame of a nondisplaced scaphoid fracture." (Emphasis added.)

According to the witness, smoking substantially increased plaintiff's risk of not healing from the time of her first surgery and was a "major issue" relative to the subsequent nonunion. The defendant contends that the trial justice properly limited the reach of this evidence by giving a preliminary instruction to the jury and by confining Dr. Akelman's testimony about the effects of smoking on bone healing to the period after the surgeries. The defendant also posits that notwithstanding any error on the part of the trial justice, plaintiff failed to preserve this issue for our review.

In *DiPetrillo*, we noted that "'[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 * * * exercises more control over experts than over lay witnesses.'" *DiPetrillo*, 729 A.2d at 688 (quoting *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786). This Court will not reverse a decision of a trial justice admitting or excluding evidence in the absence of an abuse of discretion. *State v. Gaspar*, 982 A.2d 140, 153–54 (R.I.2009). When the trial justice's discretion has been soundly and judicially exercised, in light of the facts and circumstances confronting the court and the parties, the decision will not be disturbed on appeal. *Morra v. Harrop*, 791 A.2d 472, 476–77 (R.I.2002). In this case, during the pretrial arguments, the trial justice noted the potential prejudicial effect of smoking evidence, telling counsel that:

> "[T]here will be no inquiry whatsoever about smoking by the plaintiff prior to the date of injury. It would be highly prejudicial. It's really immaterial and irrelevant to any issue that this jury needs to decide. Because the whole point of the defendant's expert's testimony is, they are going to say, on a going-forward basis, once she had a fracture, her smoking impacted the healing process."

Although after the mid-trial *voir dire* Dr. Akelman was prevented from discussing the effects of smoking on plaintiff's initial fracture, the jury was not informed of this circumstance. Before counsel's opening statements, the trial justice informed the jury that:

> "Smoking may become an issue in this case. Therefore, because some individuals may have strong feelings about this issue, whether you're for smoking or you're against smoking, I must spend a moment discussing it with you. * * * The plaintiff is a cigarette smoker. That activity is not unlawful. And obviously, you should draw no adverse or negative inference about this plaintiff based on that fact alone."

Accordingly, we are of the opinion that the trial justice appropriately limited the use of evidence about plaintiff's smoking and did not err in refusing to exclude it.

We also note that plaintiff moved mid-trial to strike Dr. Akelman's testimony based on his purported failure adequately to lay a foundation setting forth the number of cases of nonunion of fractures he encountered and the number of patients who were cigarette smokers. The trial justice rejected this motion, finding that the doctor was qualified to render an expert opinion based on his education, training and experience. We agree with this ruling; any challenge to the number of patients Dr. Akelman actually treated for scaphoid fractures would go to the weight of his testimony and not its admissibility. *See ADP Marshall, Inc. v. Brown University*, 784 A.2d 309, 314 (R.I.2001) (in which we held that "once an expert has shown that the methodology or principle underlying his or her testimony is scientifically valid and that it 'fits' an issue in the case, the expert's testimony should be put to the trier of fact to determine how much weight to accord the evidence") (quoting *Raimbeault v. Takeuchi Manufacturing (U.S.), Ltd.*, 772 A.2d 1056, 1061 (R.I.2001)). Moreover, the record discloses that plaintiff failed to object to the qualifications of Dr. Akelman to render an opinion.

## II

### Alleged Trial Errors

#### 1. Evidence of Habit

It is well settled that "[t]he admissibility of evidence is a question ad-

dressed to the sound discretion of the trial justice and will not be disturbed on appeal absent a clear abuse of that discretion." *State v. Barkmeyer*, 949 A.2d 984, 1005 (R.I.2008) (quoting *State v. Lynch*, 854 A.2d 1022, 1031 (R.I.2004)). "We give considerable latitude to a trial justice's rulings made during examination of witnesses at trial." *Id.* (quoting *State v. Gomez*, 848 A.2d 221, 237 (R.I.2004)). Therefore, the decision is reversible only if we are satisfied "that the trial justice abused his or her discretion and thereby prejudiced the defendant such that a new trial is required." *Id.* (citing *State v. Hallenbeck*, 878 A.2d 992, 1015 (R.I.2005)).

Ms. Dawkins argues that the habit evidence Dr. Siwicki offered, specifically concerning his practice in treating patients with similar symptoms did not meet the requirements of Rule 406 of the Rhode Island Rules of Evidence and therefore was admitted erroneously. Rule 406 provides in its entirety:

> "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

The plaintiff argues that the proper foundation for habit evidence required that defendant testify about how many times, before 1998, he had treated patients who presented with pain and swelling in the anatomical snuffbox. Although plaintiff acknowledges that there is no bright-line rule about the frequency of a habit for admissibility purposes, she argues that because defendant had no recollection of treating plaintiff, he should not have been allowed to testify about his routine prac-tice when treating patients who presented with her injury. The defendant responds that he properly testified that he had treated thousands of patients prior to 1998 and that based on his experiences, he developed specific routines when dealing with certain types of symptoms or injuries. Doctor Siwicki specifically testified about his routine when a patient presents with swelling or tenderness in the snuffbox area of the wrist, and also how he handles patients who disagree with his diagnosis. The defense argues that any question about the frequency of the habit goes to the weight of the evidence, not to its admissibility.

We note that Rule 406 provides no guidance about the precise definition of "habit;" however, in *State v. Cotty*, 899 A.2d 482, 494 (R.I.2006), this Court noted that "the Advisory Committee Notes to Rule 406 of the Federal Rules of Evidence (the text of which rule is identical to Rule 406 of the Rhode Island Rules of Evidence), * * * define[s] [habit] as being 'one's regular response to a repeated specific situation.'" Doctor Siwicki specifically stated that having treated thousands of patients, he developed various habits and routine practices. Although it may have been prudent for defendant to approximate how many patients presented with wrist injuries, or the number of patients he encountered who disagreed with his diagnoses, we are not convinced that the trial justice abused his discretion by admitting this testimony. There is no bright-line rule about the number of times the witness must have engaged in a particular practice before evidence of habit and routine may be admitted. The defendant properly laid the foundation that in the course of his tenure in emergency medicine he developed certain routines in treating thousands of patients over his twenty-year career.[12]

12. The plaintiff takes issue with the time frame for which defendant established his

Having done so, he was permitted to testify about those routines. Because the jury was permitted to accord whatever weight to this testimony the jurors deemed appropriate, we discern no error in its admission. The plaintiff was free to question the reliability of this testimony and challenge the number of times defendant had treated patients with wrist injuries, or how many patients he had treated who disagreed with his diagnoses, but it was not an abuse of discretion for the trial justice to admit evidence of defendant's habit.

## 2. Denial of Motion for Judgment as a Matter of Law

 The plaintiff's primary argument to this Court centers on her contention that she was entitled to a judgment as a matter of law, in accordance with Rule 50 of the Superior Court Rules of Civil Procedure, on the issues of liability and comparative negligence. This Court reviews a trial justice's decision on a motion for judgment as a matter of law *de novo*. *Medeiros v. Sitrin*, 984 A.2d 620, 625 (R.I. 2009). We therefore "examine 'the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party.'" *Id.* (quoting *Oliveira v. Jacobson*, 846 A.2d 822, 829 (R.I.2004)).

Rule 50(a)(1) provides:

"If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue."

 If, after reviewing the evidence without regard to its probative force, the trial justice determines that factual issues are present from which reasonable jurors might reach different conclusions, he or she must deny the motion for judgment as a matter of law and submit the case to the jury for its decision. *Medeiros*, 984 A.2d at 625 (citing *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I.1996)). We turn now to each of plaintiff's arguments with respect to Rule 50.

### a. Defendant's Liability

 The plaintiff asserts that the question of whether defendant was negligent in his diagnosis and treatment of her scaphoid fracture should have been decided as a matter of law because, she contends, the "uncontradicted competent evidence" demonstrates that defendant violated the standard of care for treating patients with similar symptoms. Specifically, plaintiff argues that the proper standard of care, as testified to by her expert witnesses, required defendant first, to treat plaintiff's injury as a fracture and not as a sprain; that the wrist must be immobilized rather than placed in a volar splint and, importantly, that the patient must be advised of the need for new X-rays two weeks later. According to plaintiff, the "competent" evidence unequivocally demonstrates that defendant failed to perform these steps, and

---

routines, namely that the routine practice evidence must have occurred before 1998, the point at which he treated plaintiff. We disagree. There was adequate testimony that during the approximately ten years he was an emergency room physician, defendant had treated thousands of patients, and therefore was able to describe his routines at the time he treated plaintiff.

thus breached his duty to plaintiff. After a careful review of the record, we are of the opinion that plaintiff has misconceived both the evidence presented at trial as well as the trial justice's limited role in making a Rule 50 determination.

The singular issue in the case with which there was uniform agreement among the physician-witnesses was that scaphoid fractures do not always appear on initial X-rays, but may appear on subsequent X-rays, two to three weeks after the initial injury. With respect to the standard of care for treating patients who present with such an injury, there was a divergence of expert opinion. The plaintiff's expert witness, Dr. Frankel, stated that defendant should have treated plaintiff's injury as a fracture and advised her that additional X-rays should be taken two weeks later. However, the defense witnesses opined that defendant properly treated plaintiff's injury as a sprain and informed her to follow-up with her own physician. Neither of defendant's experts thought follow-up X-rays were necessary. Notwithstanding this obvious contradiction between the opinion testimony of the experts on each side and despite the clear mandate that in passing on a Rule 50 motion the trial justice may not weigh the evidence or pass upon the credibility of the witnesses; *Medeiros*, 984 A.2d at 625 (citing *Oliveira*, 846 A.2d at 829), plaintiff insists that she was entitled to judgment as a matter of law because defendant's expert testimony "lacked requisite foundation and therefore has no weight as a matter of law." Therefore, plaintiff argues, her expert testimony was the only evidence on which the trial justice should have based his decision. This argument simply is incorrect.

Rule 702 of the Rhode Island Rules of Evidence provides that a witness may give testimony in the form of an opinion if the "witness [is] qualified as an expert by knowledge, skill, experience, training, or education." Doctors Akelman and Brewer each testified about their extensive experience as physicians treating and diagnosing patients with scaphoid fractures and nonunions and based on their training and experience, these witnesses opined about the proper standard of care applicable to an emergency room physician treating a patient with this injury. We fail to see how plaintiff can suggest that these witnesses did not lay the requisite foundation before testifying about the relevant standard of care.

The plaintiff argues that our holding in *Franco v. Latina*, 916 A.2d 1251 (R.I. 2007), controls this issue. In that case, we held that the trial justice did not abuse her discretion in finding that the defendant, a physician, had not given his expert opinion about the standard of care for a laparoscopic cholecystectomy to a degree of medical certainty, and therefore that the trial justice was not required to consider his testimony when passing on a motion for judgment as a matter of law. *Id.* at 1264–65. In *Franco*, the defendant's expert's testimony about the standard of care had been stricken by the trial justice (*id.* at 1256, 1257) and the defendant-doctor failed to proffer any foundation for his opinion about the proper standard of care, leaving only plaintiff's expert testimony on the record. *Id.* at 1264–65. That case is inapposite to the issue before this Court. Here, after a proper foundation was set forth by the physicians, each witness testified to a reasonable degree of medical certainty and proffered an opinion about the standard of care. Thus, this evidence properly was placed before the fact-finder.

In the case before us, we are of the opinion that there were factual issues with respect to the standard of care on which reasonable people could draw different

conclusions. There was adequate evidence by which the jury could have found that the proper standard of care required defendant to treat plaintiff's injury as a sprain and to inform her to follow-up with her physician, as testified to by defendant's expert witnesses.

The plaintiff further contends that even if the standard of care set forth by defendant's witnesses was credible and correct, defendant nonetheless breached his duty to plaintiff because defendant's testimony about his routine practice for patients who present with symptoms such as plaintiff's was "incompetent." Therefore plaintiff contends that the only competent evidence about what medical advice defendant gave to plaintiff was to follow-up with her physician only if any problems developed. This argument equally lacks merit. We have determined that evidence of defendant's routine practice properly was admitted and therefore is not incompetent, as plaintiff suggests; nor may the trial justice weigh that evidence when passing on a motion for judgment as a matter of law. Accordingly, we are satisfied that defendant presented legally sufficient evidence to warrant sending the case to the jury and, further, that there were factual issues on which reasonable minds could differ with respect to whether defendant met or breached the standard of care. *Medeiros,* 984 A.2d at 625. By its verdict in this case, the jury found that defendant met the standard of care and was not negligent in his diagnosis and treatment of plaintiff. We are of the opinion that there was an adequate evidentiary foundation upon which the jury reached this conclusion.[13]

### b. Comparative Negligence

 The plaintiff also argues that she was entitled to a judgment as a matter of law on the issue of comparative negligence; that is, whether the initial non-union of plaintiff's fracture and the subsequent failure of the wrist to heal following the January 1999 surgery was caused by her smoking. Specifically, plaintiff asserts that there was no legally sufficient evidence to permit the jury to consider this issue because defendant could not show that her physicians had advised her to stop smoking; an essential prerequisite, plaintiff contends, to a finding of comparative negligence. The plaintiff also asserts that it was error for the trial justice to fail to instruct the jury that it could consider plaintiff's smoking only as it related to post-injury smoking and that it could not consider her smoking at the time of defendant's alleged negligence. Because plaintiff posed no objection to the failure of the trial justice to instruct the jury on the issue of smoking, and failed to object to the verdict form that was submitted to the jury, we deem these issues waived. *See Tyre v. Swain,* 946 A.2d 1189, 1201, 1202 (R.I.2008) (in which we held that the defendant waived his opportunity to raise an objection to the jury instructions, having failed to timely object at the trial level).[14]

In this case, the jury was asked to decide whether defendant was negligent and whether that negligence was a proximate cause of plaintiff's injury. After the jury answered this inquiry in the negative, its deliberations ended and it did not reach

---

**13.** The plaintiff also stresses that in Dr. Siwicki's deposition, he indicated that "[j]udging from my notes, I probably told her she sprained her wrist. And I probably told her that she needed to follow-up if it's not improving in a few days[.]" The plaintiff has suggested that because of the equivocal nature of this testimony, the "competent evidence" shows that defendant breached his duty to her. This argument is misplaced.

**14.** We pause to note, however, that the trial justice should have provided the jury with adequate instructions on the issue of smoking.

the issue of plaintiff's comparative negligence. In her brief to this Court, plaintiff suggests that because the verdict form posed two questions—whether defendant was negligent and if so, whether that negligence was a proximate cause of her injuries—the jury could have concluded that although defendant's diagnosis and treatment of the scaphoid fracture was negligent, it could then decide that the injuries were caused by plaintiff's smoking. Therefore, plaintiff contends she was entitled to judgment as a matter of law on this issue and, further, she argues that the validity of the verdict was so infected by the trial justice's error she is entitled to a new trial. We decline to engage in such speculation. There was no objection by plaintiff to the special verdict form, or to the trial justice's instructions relative to comparative negligence, and those issues may not be raised on appeal. Although it may have been error for the trial justice to fail to instruct on the limited use of the smoking evidence, we are satisfied that the jury did not reach the question of comparative negligence, and therefore the evidence of smoking did not bear on their verdict.[15]

### III

### Posttrial Motions

### 1. Motion for a New Trial

■■■■ The plaintiff broadly contends, based on the plethora of alleged trial errors set forth in her brief, that the trial justice erred in denying her motion for a new trial. As this Court frequently has declared, "we accord great weight to a trial justice's decision on a motion for a new trial." *Oliveira*, 846 A.2d at 826. Acting as a superjuror, it is the function of the trial justice to "review the evidence and exercise his or her independent judgment 'in passing upon the weight of the evidence and the credibility of the witnesses.'" *Rhode Island Managed Eye Care, Inc. v. Blue Cross & Blue Shield of Rhode Island,* 996 A.2d 684, 695 (R.I.2010) (quoting *Franco v. Latina,* 840 A.2d 1110, 1111 (R.I.2004)). "[T]he trial justice need not engage in an exhaustive review and analysis of all of the evidence and testimony presented at trial * * * [but] need only *make reference to such facts* disclosed by the testimony *as have motivated his or her conclusion."* *Bonn v. Pepin,* 11 A.3d 76, 78 (R.I.2011) (quoting *Bourdon's, Inc. v. Ecin Industries, Inc.,* 704 A.2d 747, 758 (R.I.1997)). "We will not overturn a trial justice's decision in this regard 'unless the trial justice overlooked or misconceived the evidence or otherwise was clearly wrong.'" *Rhode Island Managed Eye Care, Inc.,* 996 A.2d at 695 (quoting *Franco,* 840 A.2d at 1112).

■■■■ The trial justice set forth the evidence he had reviewed in a bench decision on plaintiff's motion for a new trial. He specifically found that all the experts were credible, but that they had given contrary testimony on several key issues. The trial justice found that the evidence was such that reasonable minds could differ, but that based on the record before him, he could not say that the verdict was incorrect. When the trial justice has reviewed the evidence, in light of his charge to the jury, and concludes that he or she agrees with the verdict, the analysis is at its end. *See State v. Woods,* 936 A.2d 195, 197 (R.I.2007) (once the trial justice has exercised his independent judgment and passed on the evidence in light of the charge to the jury, and "the trial justice

---

15. Although plaintiff raises several other issues with respect to comparative negligence, based on the jury's determination that Dr. Siwicki was not negligent, the issue of comparative negligence is not before us.

agrees with the verdict, then the role of the trial justice is over and the motion for a new trial is properly denied") (citing *State v. Marini*, 638 A.2d 507, 515–16 (R.I. 1994)). We are satisfied that the trial justice did not abuse his discretion in denying plaintiff's motion for a new trial.

### 2. Motion for Relief Concerning Alleged Fraud on Court

■■■ In addition to plaintiff's motion for a new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure, Ms. Dawkins filed a motion entitled "Plaintiff's motion for relief regarding defendant's fraud on the court," in which plaintiff asserted she was entitled to a new trial based on misrepresentations that she contends defendant made on the issue of smoking.[16] The crux of plaintiff's motion was summarized by the trial justice as plaintiff's demand for a new trial because defendant's expert witnesses "did not testify in complete conformity with their written summaries provided through discovery and this [c]ourt's pretrial order[,]" thus, suggesting that "defendant engaged in a subterfuge designed to mislead the [c]ourt and ultimately deprive the plaintiff of a fair trial." The trial justice carefully reviewed the evidence and the statements of counsel and found that there had been no fraud perpetrated upon the court.[17]

On appeal, plaintiff makes a similar argument, focusing on the fact that defendant elected to not inquire of Dr. Brewer about plaintiff's smoking, despite indicating that he would do so at the pretrial hearing. The plaintiff also focuses on a single sentence in Dr. Akelman's *voir dire*

testimony. According to plaintiff, Dr. Akelman testified that "there was no scientific basis for concluding with any degree of certainty that smoking was a contributing cause of the nonunion of her scaphoid fracture." We disagree with this characterization. A fair reading of Dr. Akelman's testimony revealed that he opined, within a reasonable degree of medical certainty, that smoking is a contributing cause of nonunions of scaphoid bones but that he could not quantify the risk. The plaintiff asserts that this testimony "was diametrically opposite to the representations made by defendant[,]" prior to trial and argues that this Court's holding in *Lett v. Providence Journal Co.*, 798 A.2d 355 (R.I.2002) controls the result in this case. In *Lett*, we noted with approval the trial court's adoption of the following definition of fraud:

> "A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Id.* at 364 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir.1989)).

In *Lett*, the trial justice found that the two plaintiffs had entered into a scheme in which they exaggerated the health and well-being of the plaintiff Louis Guilliano, to permit him to avoid testifying during the trial. *Lett*, 798 A.2d at 366–67. This

16. Before this Court, plaintiff has suggested that the appropriate remedy would be judgment as a matter of law on the issue of defendant's liability, leaving only the issue of damages for a retrial.

17. The trial justice expressed disappointment in plaintiff's use of the term fraud in her pleadings, and found that it was inflammatory, inappropriate and lacked any factual support in the record. We agree with the trial justice that plaintiff used strong language in this attack.

shocking conduct simply is not analogous to the case before us.

The fact that the defendant elected to present the testimony of one of his expert witnesses, instead of two, is a strategic decision that lawyers make every day and cannot be considered fraudulent in any manner. Secondly, as extensively discussed, the plaintiff has misinterpreted Dr. Akelman's testimony about smoking and the initial nonunion of the plaintiff's scaphoid fracture. Although during the pretrial motion, defense counsel alerted the trial justice of his intention to have Dr. Akelman testify that smoking contributed to the initial nonunion, during the mid-trial *voir dire* hearing, Dr. Akelman testified that he did not believe there was science that could quantify the risk of not healing. Thereupon, the trial justice refused to allow Dr. Akelman to render an opinion as it related to the initial nonunion of the fracture and this evidence did not come before the jury. We see nothing in the record before us that suggests any fraudulent or misleading practices. We therefore are satisfied that the trial justice did not abuse his discretion when he denied the plaintiff's motion for relief.

### Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed. The papers in this case may be returned to the Superior Court.

Justices FLAHERTY and ROBINSON did not participate.